ISBELL ENTERPRISES, INC., Plaintiff,

v.

CITIZENS CASUALTY CO. OF NEW YORK, Defendant-Third Party Plaintiff-Appellant,

v.

MARINE MART, INC., Third Party Defendant-Appellee.

No. 29278

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Aug. 14, 1970.

Gordon L. Briscoe, Harlingen, Tex., for appellant.

Eduardo R. Rodriguez, Benjamin S. Hardy, Brownsville, Tex., for Marine Mart, Inc.

Before JOHN R. BROWN, Chief Judge, and MORGAN and INGRAHAM, Circuit Judges.

JOHN R. BROWN, Chief Judge:

"Touching the Adventures and Perils which we, the said Underwriters, are contented to bear and take upon us, they are of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints, and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, &c., or any part thereof * * *." So goes the Marine Hull Insurance Policy. So goes also —really went—this case which began as a maritime action by Shipowner [1] against the Underwriter[2] for the constructive total loss of the fishing vessel Captain Cracker arising from actions by a crew member who, without authority, single-handedly took her to sea from under the very eyes of three Shipyard[3] people. With all of the romance that the quaint language of a Hull Policy conjures up, it looked fairly certain that in this latter day we would have to determine whether a crew member, obviously under mental aberrations, whose condition was diagnosed as a schizophrenic reaction of the acute undifferentiated type, and whose pre-Odyssey behavior was characterized by a psychiatrist witness as a psychotic state, could have, as the District Court held, the "willfulness" associated with barratry of master or crew and if, strictly speaking, he did not, then whether such taking was within the coverage for "all other like perils, losses, and misfortunes".[4]

But this was not to be. For the Underwriter for its own good and sufficient reasons capitulated, paid off Shipowner's claim, to concentrate its attack on the District Judge's denial of recovery against Shipyard, impleaded as a defendant, F.R. Civ.P. 14,[5] on the theory that as bailee, it had failed to redeliver or in any event was negligent. We affirm.

### I.

Before getting to the merits we think it appropriate to update, perhaps for the last time,[6] the Court's experience in judicial screening of cases which includes as a major element the disposition of a case as a class Summary II on the briefs without oral argument.[7] The system was instituted on December 13, 1968. Thus our experience covers nearly two years and full statistical data is available for the 18 months comprising the last half of FY 1969[8] and all of FY 1970.

The system and its operation are fully outlined in *Murphy* and *Huth* (see note

---

1. Isbell Enterprises, Inc. of which Elliff was the general manager.

2. Citizens Casualty Co. of New York.

3. Marine Mart, Inc., of which Zimmerman was the general manager of repairs.

4. The District Court held alternatively that it was, relying on Feinberg v. Insurance Company of North America, 1 Cir., 1958, 260 F.2d 525, 527.

5. See Advisory Committee Notes to Rule 14(a) and new 14(c) incorporating old Admiralty Rule 56.

6. We say perhaps for the last time because this was updating in conjunction with Murphy v. Houma Well Service, 5 Cir., 1969, 409 F.2d 804, Part I and Huth v. Southern Pacific Co., 5 Cir., 1969, 417

F.2d 526, Part I. This will adequately inform the Bench, the Bar, litigants, scholars and that vast body of people now naturally concerned in good judicial administration about this remarkable judicial tool.

7. Cases determined to warrant oral argument are classed as III (15 minute argument) and IV (full F.R.A.P. 30 minute argument). We ignore as statistically and operationally insignificant Class I (frivolous appeals).

8. Except where otherwise indicated FY 1969 is used to identify our first 6 month experience. It refers to the period January 1–June 30, 1969, plus the tag end period December 13–December 31, 1968.

6, supra). The procedure continues to work with increasing judicial efficiency. As the figures reflect there has been a substantial increase in the number and percentage of cases classed as Summary II for disposition without oral argument. From 32.7% for FY 1969 this has increased to 38.1% for the full FY 1970. There has likewise been a slight percentage increase of 3% in class III (limited argument) with a sharp decline of 8% in Class IV.[9]

As the classification undoubtedly is affected to some extent by the nature of the cases making up our docket from time to time, it is interesting to see some rather marked changes in a relatively short space of time. Although the percentage of direct criminal appeals has decreased in relation to the overall docket (see notes 10 and 12, infra) there has been a percentage increase in relation to the overall docket of 5.5% in habeas and § 2255 cases with a slight decrease of 1.7% in the civil cases.[10] Of course, there is a spectacular numerical increase in the total docket year after year. See note 15.

Of great importance is the internal make-up by general type of the cases which were classed as Summary II and which comprised 32.7% and 38.1% respectively (see note 9, supra). Of the cases classed Summary II, direct criminal appeals have run from 26.8% to 29.0%. There has been an expected increase in the number of Summary II habeas corpus and § 2255 cases, but there has been a decrease of some 7.7% in Summary II civil cases for causes not readily identifiable.[11] But the per-

9.

*Classification Breakdown in Numbers and Percentages*

| Class | F.Y. 1969 | | F.Y. 1970 | |
|---|---|---|---|---|
| | *Number* | *%* | *Number* | *%* |
| II | 218 | 32.7 | 452 | 38.1 |
| III | 265 | 39.7 | 506 | 42.7 |
| IV | 184 | 27.6 | 229 | 19.2 |
| TOTAL | 667 | 100.0 | 1187 | 100.0 |

The percentage figures do not tell the whole story. See e.g. Class IV with percentage reduction of 8%, the number of IVs for the 12 month period exceeded by only 45 the total of 184 for the 6 month period.

10. The following table shows by number and percentage the makeup of the docket of cases fully briefed and submitted on the merits:

| Subject | F.Y. 1969 | | F.Y. 1970 | |
|---|---|---|---|---|
| | *Number* | *%* | *Number* | *%* |
| Criminal | 177 | 26.5 | 270 | 22.7 |
| Habeas & 2255 | 85 | 12.7 | 216 | 18.2 |
| Civil | 405 | 60.8 | 701 | 59.1 |
| | 667 | 100.0 | 1187 | 100.0 |

Again, percentages alone can be misleading. See e.g. Habeas, 2255, the numerical gain over FY 1969 is approximately 44% in contrast to a percentage increase of but 5.5% in relation to the overall docket.

11.

*Summary II by Type of Case Number and Percentage*

| | FY 1969 | | FY 1970 | | Overall |
|---|---|---|---|---|---|
| | *Number* | *%* | *Number* | *%* | *%* |
| Habeas § 2255 | 56 | 25.7 | 141 | 31.2 | 29.5 |
| Direct Criminal | 58 | 26.8 | 131 | 29.0 | 28.2 |
| Civil | 104 | 47.5 | 180 | 39.8 | 42.3 |
| | 218 | | 425 | | |

*RECAP*

| | *No. Summary II* | *Total Cases Screened* |
|---|---|---|
| FY 1969 | 218 | 667 |
| FY 1970 | 452 | 1187 |
| | 670 | 1854 |

centage of the general types of cases making up the docket (see note 9, *supra*) or the percentage of particular types of cases (civil, criminal, etc.) classed as Summary II (see note 11, *supra*) does not tell the whole story about what is being accomplished. Thus of the 270 direct criminal appeals in FY 1970 (see notes 10 and 12, *infra*) 131 were classed Summary II (48.5%) in contrast to that of the first period, FY 1969, when, out of 177 cases (see note 12, *infra* only 31.6% were classed Summary II. This means that approximately half of the direct criminal appeals are now being disposed of with no delay. As we pointed out in *Huth* (note 6, *supra*, 417 F.2d 529), shortening the time between conviction and final disposition in criminal cases is a matter of great public concern. And in this area the screening process accomplishes much since all delay between the last brief and the submission to a panel is avoided.

Another area of great public concern is that of post-conviction cases. Al-

though this category comprises but approximately 18% of the whole docket (see note 10, *supra*) out of the 216 habeas and § 2255 cases 141, nearly 66% were classed Summary II (see note 12, *infra*). But expedited disposition is not limited to such cases. For example in the civil cases over 24% of private civil, 27% of tax, 37% admiralty, and 30% U. S. civil cases were classed Summary II (see note 12, *infra*).

Although, as indicated, there are shifts in the internal make-up of the docket and in the nature of cases classed Summary II, this system continues to operate with an across-the-board-even-handedness over the full spectrum of the Court's docket. This includes civil cases of all kinds along with direct criminal appeals and post-conviction habeas corpus and § 2255 matters.[12]

And for a like period this has accounted for a substantial number of

12.

### Cases Screened and Classed Summary II by Subject Matter

| Type of Case | FY 1969 | | FY 1970 | |
|---|---|---|---|---|
| | Total Number | Total Summary II | Total Number | Total Summary II |
| Direct Criminal | 177 | 58 | 270 | 131 |
| Habeas Corpus | 63 | 39 | 158 | 93 |
| § 2255 | 22 | 17 | 58 | 48 |
| *Civil* | | | | |
| Private Civil | 209 | 54 | 391 | 94 |
| U. S. Civil | 68 | 20 | 93 | 28 |
| Tax | 29 | 5 | 65 | 18 |
| Bankruptcy | 10 | 5 | 24 | 8 |
| NLRB | 44 | 10 | 57 | 13 |
| Other Agency | 4 | — | 9 | 3 |
| Civil Rights | 25 | 4 | 32 | 5 |
| Admiralty | 16 | 6 | 30 | 11 |
| | 667 | 218 | 1187 | 452 |

opinions approximately a fourth of which are signed.[13]

Of course the need to explore all procedures with inventive judicial resourcefulness continues. As reflected in NLRB v. Amalgamated Clothing Workers of America, 5 Cir., 1970, 430 F.2d 966 Part I, outlining the Court's reasons for adopting Rule 21 for affirmance without opinion, the volume of new cases already exceeds even very recent projections [14] so that for the Fifth Circuit [15] and many of the other Courts of Appeals [16] the outlook is portentous.

Our own experience has borne out our hopes and convictions that judicial screening would be a workable, fair method which would markedly increase our output and enable us to at least keep abreast of this flood tide.[17] The system has so far successfully passed muster on review in cases directly attacking the procedure of classification and disposition as Summary II on briefs without oral argument.[18]

Because of its widespread use—in numbers of cases, numbers of opinions and percentages covering the full spec-

13.

| | *Summary II Opinions* | |
| --- | --- | --- |
| | *F.Y. 1969* | *F.Y. 1970* |
| Per Curiam | 109 | 326 |
| Signed | 41 | 100 |
| Total | 150 | 426 |

The above figures show that Summary II opinions comprise a substantial part of the whole opinion output:

| | *F.Y. 1969 \** | *F.Y. 1970* |
| --- | --- | --- |
| Per Curiam | 525 | 633 |
| Signed | 604 | 638 |
| Total | 1129 | 1271 |

\* Full 12 month period.

14. Survey 1967 and Resurvey 1970, see note 5 *Amalgamated.*

15. See note 4, 430 F.2d 966, 968. In but six years our volume has increased from 1073 in FY 1965 to 1794 actual cases in FY 1970 (all consolidations and cross appeals have been eliminated). The FY 1970 increase over FY 1969 (1489) was the largest numerical increase ever, and the largest precentage (20.5%) since FY 1963.

More frightening are the upward adjustments to the Shafroth 1970 resurvey projections for FY 1971–1975 based on Fifth Circuit experience:

| | *1970 Survey* | *Upward Revision Fifth Circuit* |
| --- | --- | --- |
| *F.Y.* | | |
| 1971 | 1,852 | 1,961 |
| 1972 | 2,006 | 2,124 |
| 1973 | 2,159 | 2,286 |
| 1974 | 2,311 | 2,447 |
| 1975 | 2,464 | 2,609 |

16. See No. 6, Amalgamated for Shafroth 1970 resurvey projections for all Courts of Appeals. Against a 1970 nationwide input of 9,850 cases, FY 1975 will see 13,801, with like spectacular increases for the District of Columbia (1,478), Fourth (1,820) and Ninth (2,166) Circuits.

17. See notes 4 and 11 of *Amalgamated.* As the following table shows, there has been an exponential increase in the number of cases filed, but since 1967 the court has disposed of more cases than filed the preceding year, and the carryover to the succeeding year has been disproportionately smaller:

| Year | No. Cases Filed | No. Cases Disposed Of | Pending Cases |
| --- | --- | --- | --- |
| 1960 | 584 | 554 | 278 |
| 1961 | 639 | 514 | 403 |
| 1962 | 717 | 598 | 522 |
| 1963 | 876 | 765 | 633 |
| 1964 | 1033 | 931 | 735 |
| 1965 | 1073 | 878 | 930 |
| 1966 | 1099 | 1028 | 1001 |
| 1967 | 1189 | 1171 | 1019 |
| 1968 | 1347 | 1290 | 1076 |
| 1969 | 1489 | 1496 | 1069 |
| 1970 | 1794 | 1682 | 1181 |

Likewise, there has been a marked reduction from 12.5 months to 7.5 months in FY 1969 of the median time from the filing of the complete record to the final disposition of the appeal, with a computed further decrease for FY 1970, in comparison with the national average of 8.3 months. (See Table B4 of the Annual Report of the Director of the Administrative Office of the U.S. Courts). For FY 1969 and FY 1970 much of this is due to screening.

Through judicial screening and the reduction in the time for calendar arguments (38 actual court weeks with screening for FY 1970 in comparison to 59 which would have been required without screening) each judge participates in 31% more cases with an opinion output of like increase. Additionally, this was all done by active judges of this court with help from the senior judges and without requiring as before a large number of visiting circuit and district judges.

18. United States v. Ambers, 5 Cir., 1969, 416 F.2d 942, cert. denied, 1970, 396 U.S.

trum of this Court's business—we do not think there will be any need further to alert the Bar and others to the existence or operation of the system and its results.

With the continuance of standardized editorial headnotes in the published reports indicating for both civil and criminal cases that the summary calendar classification is a judicial determination that oral argument is not required,[19] we do not think it is any longer necessary for each Summary II opinion, either in the text or by footnote, to contain the statement long employed,[20] or shortened variations of it.

■ For the future we will follow a simplified procedure by which the published opinion will simply bear the caption "Summary Calendar".[21] Without more—by note or text—this will amount to a shorthand incorporation of the statements, reasons and explanatory comments found in *Murphy, Huth* and this case for the use of Summary II disposition.

### Part II

On January 11, 1968 Shipowner delivered F/V Captain Cracker to Shipyard for some small repairs which could be done afloat. She was moored outside of, and made fast by two lines to, M/V Barto II, with a spring line running across M/V Barto II onto the dock. On arrival, the shifting crew and all others then aboard left F/V Captain Cracker except Estrada, a crew member serving as a shrimp header. He was allowed, but not required, to stay aboard. While aboard he was expected only to pump the vessel as needed and "guard" it since no watchman was at the yard. He had no authority to navigate or move the vessel. Shipyard permitted crew members to remain aboard but Zimmerman (note 3, supra) had no knowledge of Estrada's presence.

By evening of January 11 the inside welding being done by the Hurtados, Padre y hijo, was completed. With the expectation of returning next morning to weld the patches on the outside of the hull, the Hurtados left their welding tools, cables, etc. inside the lazeret of the vessel with electric cables, lines etc. running out through ports across the deck of F/V Captain Cracker, and M/V Barto II to a welding machine on the dock. During that afternoon, Hurtados Sr. observed Estrada pacing about the deck, and both father and son testified they thought that Estrada was acting "deranged".

1039, 90 S.Ct. 686, 24 L.Ed.2d 683; In re Louisiana Loan & Thrift Corp., 1969, 5 Cir., 416 F.2d 898, cert. denied, 1970, Holahan v. Reynolds, 397 U.S. 912, 90 S.Ct. 912, 25 L.Ed.2d 93.

19. For civil cases, see e. g.,
 1. Appeal and Error 826
 Where appeal from federal habeas corpus proceeding by prisoner was not of such character as to justify oral argument, federal Court of Appeals directed clerk to place case on summary calendar and to notify parties in writing. U.S.Ct. of App. 5th Cir. Rule 18, 28 U.S.C.A.
For Criminal cases, see e. g.,
 1. Criminal Law 1132

 Merits of appeal from judgment denying relief on motion to vacate judgment and sentence were of such character as not to justify oral argument, and clerk was directed to place case on summary calendar and notify parties in writing. 28 U.S.C.A. § 2255; U.S.Ct. of App. 5th Cir. Rule 18, 28 U.S.C.A.

20. See, e. g.,
 Pursuant to Rule 18 of the Rules of this Court, we have concluded on the merits that this case is of such character as not to justify oral argument and have directed the clerk to place the case on the Summary Calendar and to notify the parties in writing. See Murphy v. Houma Well Service, 5 Cir., 1969, 409 F.2d 804, Part I; and Huth v. Southern Pacific Co., 5 Cir., 1969, 417 F.2d 526, Part I.

21. To acquaint the Bar with this practice each Summary II opinion will for an interim bear an editorial note tied to Summary Calendar* in the caption: "Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York, et al., 5 Cir., 1970, 431 F.2d 409, Part I."

During the night a Texas "Norther" blew in bringing heavy rain and high winds that made shrimping in the Gulf prohibitive. On arrival at the dock at about 7 A.M. January 12 the Hurtados saw that F/V Captain Cracker's engine was running. When they went aboard the vessel to get their welding tools to commence the outside repairs they found that their welding torches, cables, hoses and the like had been thrown overboard and were down in the water between F/V Captain Cracker and M/V Barto II. They found Estrada in a cabin on F/V Captain Cracker sitting fully clothed. The Hurtados variously described Estrada's appearance as "desperate", "mentally confused", "crazy", "a man talking in a strange manner" who "wasn't a normal man". When asked why he had thrown the welding equipment overboard Estrada replied that "he was hungry and wanted to go fishing". Shortly, however, Estrada aided the Hurtados in retrieving and cleaning their welding equipment.

About this time Zimmerman, arriving for his usual morning inspections, instructed the Hurtados to stop work on the outside of F/V Captain Cracker and to work inside on M/V Barto II. At approximately 7:25 A.M., while he was aboard M/V Wandering Boy, then moored astern the other two vessels, Zimmerman (along with the Hurtados) noticed that F/V Captain Cracker was moving backward and forward and scraping against the M/V Barto II. F/V Captain Cracker was secured then only by its nylon spring line onto the dock across the deck of the M/V Barto II. On inquiry why the boat was moving, Hurtado, Jr. told Zimmerman "the man wanted to go fishing and * * * was moving the boat". Oddly enough, the Hurtados did not tell Zimmerman that "the man" had thrown their gear overboard and was acting in a very strange manner.

Apparently believing that Estrada was maneuvering F/V Captain Cracker to return to Shipowner's docks and that he had inadvertently left the spring line secured, Zimmerman attempted to attract his attention by shouting to him. Realizing his efforts to alert Estrada had been ineffective, Zimmerman became apprehensive that M/V Barto II would be pulled back against M/V Wandering Boy. Consequently, he cut the ¾ inch nylon spring line with a pocket knife. At approximately 7:30 A.M. he saw F/V Captain Cracker sail away. Little did he know that it was her last voyage.

Zimmerman made no inquiry about Estrada nor did he notify Elliff or any one else with Shipowner. He had, in the meantime, received no instructions from Shipowner for redelivery of the vessel, and he knew that repairs as ordered had not been completed. However, within minutes (and about 8 A.M.) Elliff, Shipowner's manager, arrived to check the progress of repairs to F/V Captain Cracker and M/V Barto II. Elliff saw that F/V Captain Cracker was missing, but with no Shipyard people about he returned to his offices located a few minutes away. With the time fixed by the Judge at about 45 minutes to an hour after F/V Captain Cracker had broken ground on her terminal voyage, Elliff talked to Zimmerman and learned of the vessel's departure and the probable identity of "the man" at her wheel.

From Shipyard to the Gulf of Mexico through Brazos Santiago Pass was about a 40 to 45 minute run. Elliff notified the Coastguard station at the Pass. The station first disclaimed having seen the vessel but later reported that F/V Captain Cracker had been spotted circling about offshore in the Gulf. Oddly enough, the Coastguard refused to give chase unless a local law officer was aboard with a warrant. By the time a warrant was obtained, at approximately noon, Estrada had already headed south and before the day was over, F/V Captain Cracker went aground off the coast of Mexico, approximately 180 miles south of Port Isabel. It rounds out the saga to record that fortunately Estrada was saved and received extensive mental treatment in the State Mental Hospital in San Antonio.

On this the Judge found (A) Underwriter liable on the policy and, (B) on the impleader, that (i) the Shipyard was not negligent up to the time of departure of F/V Captain Cracker, but that (ii) it was negligent in failing to notify Shipowner but (iii) this negligence was not a proximate cause of the loss.

Underwriter's best theory was the simple but awesome one of conversion: vessel delivered by Shipowner to Shipyard as bailee; Shipyard allowed one other than Shipowner to take her away. The rule has sound roots ashore [22] and we agree with others, David Crystal, Inc. v. Cunard Steam-Ship Company, 1963, SDNY, 223 F.Supp. 273, 286, that it has sufficient buoyancy for admiralty as well. When clear precedents are lacking "in the law of the sea, admiralty judges often look to the law prevailing on the land * * *" Igneri v. Cie. de Transports Oceaniques, 2nd Cir., 1963, 323 F.2d 257, 1963 AMC 2318.

 The trouble with this is that the bailment to Shipyard was not one giving it temporary complete dominion and control over the vessel. True, Estrada was little more than free boarder living on the ship with Shipowner's leave. He did not have authority to navigate or move the vessel. But Shipowner allowed him to stay and in the absence of facts known to responsible persons of Shipyard concerning lack of authority it was not for Shipyard to question the operation and removal of the vessel by one left aboard by Shipowner. Under such circumstances the bailment obligation to redeliver under the conversion principle is modified to the extent the owner reserves—or from the bailee's viewpoint, appears to reserve—some control over the activity which operationally inflicts the harm. Stegemann v. Miami Beach Boat Slips, 5 Cir., 1954, 213 F.2d 561; Sisung v. Tiger Pass Shipyard Co., 5 Cir., 1962, 303 F.2d 318. And on this record, the factual qualifications inherent in this assessment are way above the Plimsoll mark of F.R. Civ.P. 52(a).

 On the negligence theories, Southport Transit Co. v. Avondale Marine Ways, 5 Cir., 1956, 234 F.2d 947, 1956 AMC 1498, we likewise conclude that the fact findings are warranted. Clearly the Shipyard is not to be held accountable just by what the two Hurtados knew. Perhaps it was a dereliction for them not to advise Zimmerman of the strange behavior which all can now see was so indicative. But it is hardly a welder's obligation. And the outsider —Shipowner or Underwriter as subrogee —is scarcely in a position to make out a claim that these two mechanics in the lower hierarchical strata of Shipyard's organization breached a duty owing Shipowner-Underwriter in not reporting these incidents.

That reduces it essentially to what Zimmerman could see. Since the record more than suggests that he was an experienced shipyard person familiar with the operation of the class of vessels built and repaired by it, the Judge was entitled to conclude that by actively assisting in cutting the spring line Zimmerman was acting under the good faith belief that for some reason Shipowner was having the vessel removed before repairs were completed. The Judge applied the correct principles, see Commercial Molasses Corporation v. New York Tank Barge Corporation, 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89, 1941 AMC 180, to impose on the bailee the duty of going forward with the explanation which the Court then held was adequate. Negligence was, after all, a question of fact.

We need not determine academically the correctness of the Judge's conclusion that Shipyard was negligent thereafter in failing to notify Shipowner of the vessel's departure because the Court went on to find that such negligence was not

---

22. Restatement (2d) Torts (1965) § 234: "A bailee, agent, or servant who makes an unauthorized delivery of a chattel is subject to liability for conversion to his bailor, principal, or master unless he delivers to one who is entitled to immediate possession of the chattel."

a proximate cause of the loss. We think the latter part of the determination is readily warranted. In a variety of ways Elliff, for Shipowner, made positively clear that had he been called earlier he would not have done anything about trying to search out and recapture F/V Captain Cracker. He did not limit this in point of time in terms of whether the vessel was still in inland waters or had sailed out into the more tempestuous Gulf of Mexico. What he emphasized was the personal hazard to those who might undertake the capture since everyone would know that if a shrimpheader absconded with a vessel and put to sea under prevailing weather conditions, then that crew member could not possibly be in his right mind.

What the owner candidly states would not have been done may not be turned into something else by one—Underwriter —who as subrogee takes the Flotsam with the jetsam. Compania Anonima Venezolana de Navegacion v. A. J. Perez Export Co., 5 Cir., 1962, 303 F.2d 692, 1962 AMC 1710, cert. denied .1962, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276.

Affirmed.