497 F.2d 36
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jean CARMICHAEL, Defendant-Appellant.
No. 73-3304 Summary Calendar.*
*Rule 18, 5 Cir.; see Isbell Enterprises, Inc.
v.
Citizens Casualty Co. of New York et al., 5 Cir. 1970, 431 F.2d 409.
 United States Court of Appeals, Fifth Circuit.
 July 3, 1974.
 
 John H. Duhig, Miami, Fla., for defendant-appellant.
 John W. Stokes, Jr., U.S. Atty., E. Ray Taylor, Jr., Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.
 Before BROWN, Chief Judge, and THORNBERRY and AINSWORTH, Circuit Judges
 JOHN R. BROWN, Chief Judge:
 
 
 1
 Appellant, Ms. Jean Carmichael, was convicted on two counts of violating 18 U.S.C.A. 1343 and one count of violating 18 U.S.C.A. 2314.[1] The sum and substance of these violations was that appellant devised a scheme to defraud Ms. Laura Harris, Ms. Vonna McNiff, and Mr. Heywood Allen out of a total of $17,500.00 by means of false and fraudulent pretenses. The appellant's sole contention on appeal is that there was insufficient evidence to support the verdict as to these three counts. Viewing the evidence in a light most favorable to the verdict, Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, we find more than sufficient evidence to support the jury's findings. We therefore affirm.
 
 The Set-Up
 
 2
 The saga of the parting of Ms. McNiff, Ms. Harris, Mr. Allen and their money began one night in May of 1971. Ms. McNiff and Ms. Harris, while on vacation in Miami, Florida from Atlanta, Georgia, requested their friend Mr. Allen to squire them to a local exclusive private club to dine. While at the club, Mr. Allen saw the appellant who was an acquaintance of his and took the opportunity to introduce the three women. The appellant immediately impressed Ms. Harris and Ms. McNiff as being a person of great charm, generosity, wealth, and social position. She dressed elegantly, engaged Mr. Allen in a conversation concerning the Cadillac she was planning on purchasing and insisted that she and her escort pay for everyone's dinner. Later that evening she invited everyone to her sumptuous home and proceeded to dazzle them with her expensive and varied wardrobe. She made it a point to display her two full-length mink coats, one of which she said was given her by a prominent politician. She was, she stated, on very good terms with the politician's prestigious family.
 
 
 3
 During the early months of her friendship with Ms. McNiff and Ms. Harris, the appellant clearly attempted to perpetuate the illusion of wealth and grandeur she had already created. For example, the appellant on one occasion off-handedly remarked to the two women that she wished she could take them to her house in Jamaica but unfortunately she had recently sold it. On another occasion she paid for the two women's memberships and dinners plus a $100.00 life membership for herself at a cystic fibrosis fund raising affair. Still another time she was observed paying the expenses of herself, her two daughters, her son-in-law, her grandchild, and two of her friends during an ocean cruise to the Bahamas.
 
 
 4
 If there ever lingered doubt in the minds of Ms. McNiff and Ms. Harris as to the appellant's solvency, it was dispelled after they attended the wedding the appellant provided for her daughter. The appellant had 5,000 yellow longstemmed roses flown in from California at what she indicated was a 'great expense'. She also provided at least one orchestra and several bars for some 600 guests and held a reception and dinner at an exclusive Miami club following the wedding. At one time during the affair, the appellant indicated to the two women that she may have spent as much as $30,000.00 on the wedding although at trial she confessed that $8,000.00 was a more reasonable estimate and that the roses were donated by her ex-husband, a wholesale florist in California. Although it is not necessary to conclude that the appellant calculated such events solely to mislead Ms. McNiff and Ms. Harris, it is certain the fact finder could hold that she grossly exaggerated her expenditures and her financial ability and that she took every advantage to create a false impression of wealth.
 
 The Sting
 
 5
 Some time in early June of 1972, the appellant telephoned Ms. McNiff, who had returned to Atlanta, long distance from Miami. The appellant was distraught. When asked to reveal the source of her distress, she confessed it was financial She owned, she alleged, a large tract of land in Ohio which could be sold for a $2,000,000.00 profit as a shopping center development if only she could raise $90,000.00 with which to pay off back taxes and attorneys' fees. She stated that one of her bankers would lend her $50,000.00 and a mortgage on her home would yield $20,000.00. The rest of her wealth, however, was tied up in various investments and thus unliquid. She desperately needed several thousand dollars, and would be able to repay whoever lent her that amount within two weeks since the shopping center deal was about to be closed. Based on over a year of observing the appellant act as a woman of means, Ms. McNiff wired her $7,500.00, the majority of her life's savings. Unfortunately, the appellant owned no property in Ohio. In fact, she stated at trial, she needed the money to repay several other of her friends who had also lent her various sums and to encourage her ex-husband to put the title of their sumptuous home in her name.
 
 
 6
 Two weeks later, on the date the loan was to be repaid, Ms. McNiff and Ms. Harris flew to Florida and met the appellant. By then, however, a curious thing had happened-- The appellant needed more money. Without stating why Ms. McNiff's $7,500.00 was insufficient, she reiterated her plea for more money based on the apocryphal Ohio land scheme. To induce Ms. Harris to make her a loan, the appellant produced a stock receipt for $130,000.00 worth of IBM stock which she indicated was in the hands of her broker being sold and could be used as collateral. The stock receipt was indeed genuine but unfortunately belonged to a friend of the appellant's, Mr. Robert Connally, who had only temporarily lent the appellant the certificates for business reasons. As a further inducement, the appellant also stated that if Ms. Harris would lend her $7,500.00, both she and Ms. McNiff would receive their principal plus a $1,500.00 profit within two more weeks. Ms. Harris agreed to the loan.
 
 
 7
 Encouraged by her success, the appellant then made the incredibly audacious suggestion that Ms. Harris telephone their mutual friend, Mr. Heywood Allen, and ask him for a loan of $10,000.00. To soften the blow, the appellant suggested Ms. Harris tell Mr. Allen that the money was to be used in a profitable business venture, that he would be repaid in two weeks with 10% Interest, and that the borrower (who was to remain anonymous) had $130,000.00 worth of IBM stock as collateral. Based on these representations plus his friendship of long-standing with Ms. Harris, Mr. Allen consented to the loan. He asked Ms. Harris, however, to personally sign a note for the full amount. After making arrangements with her bank and obtaining Mr. Allen's check, Ms. Harris wired the $17,500.00 to the appellant in Miami. Several days later, after being pressed by Ms. Harris, the appellant signed unsecured notes to Ms. Harris, Ms. McNiff and Mr. Allen covering their loans.
 
 No Blood In The Turnip
 
 8
 As was predictable, the months that followed the making of the loans were filled with a series of unsuccessful attempts by Ms. Harris, Ms. McNiff, and Mr. Allen to collect their money and a series of ingenious and sometimes belligerent explanations by the appellant as to why she was unable to repay them. On the day the money was due, for example, when Ms. Harris called to arrange repayment, the appellant stated she had just lost $40,000.00 in the stock market and could not be bothered thinking about repaying such an insignificant sum as $17,500.00. When contacted several days later, the appellant was unable to repay the loan because her fictitious Ohio property had been flooded. On another occasion, the appellant stated her husband was suing her for a large sum of money as a result of their divorce and every dollar she had was tied up in court-- perhaps the most accurate and truthful of all her excuses. Each time she was contacted concerning repayment, she assured the women they would be repaid shortly because she was anticipating some external source of funds. In July, the source was to be appellant's married friend Bob. In september, she expected funds from her father's estate in California. On several occasions she promised she would stop in Atlanta on her way to or from settling her father's estate in California and deliver the money. Of course she never did. Meanwhile, however, she continued to live a profligate life, indulging in several ocean cruises with her daughters as was her wont.
 
 
 9
 Sometime in late August Ms. Harris' already aroused suspicions that she would never be repaid were heightened. Increasingly curious as to why her seemingly wealthy friend was unable to repay such a modest amount, Ms. Harris contacted appellant's attorney and in response to her questioning he related that to the best of his knowledge appellant neither owned any property in Ohio nor $130,000.00 worth of IBM stock. He also stated that 'there were judgments against (the appellant) and unless (Ms. Harris) wanted to stand in line behind a quarter of a million dollars he didn't think there was much of a chance of (her) getting (her) money in a civil suit.' After several more fruitless telephone calls to the appellant, both Ms. McNiff and Ms. Harris flew to Miami to attempt to register their unsecured notes. In attempting to register their notes, they discovered there was in fact a $250,000.00 judgment on record against the appellant which sufficiently deterred them from taking further legal action.
 
 
 10
 Sometime in November of 1972, after a particularly threatening phone call from Ms. Harris, the appellant did forward Ms. McNiff a check for $500.00 in Ms. Harris' name with a note stating she was on her way to California to raise more money. After one last attempt to obtain payment on November 17, Ms. Harris ceased contact with the appellant and sought help from the FBI.
 
 
 11
 What Ms. McNiff, Ms. Harris, and Mr. Allen did not know either at the time they made the loans or during the attempted collection process was that in January of 1971, the appellant had asked for and obtained a $25,000.00 loan from another friend, Mr. Robert Connally, on the strength of his appraisal of her illusionary wealth and the representation that she was about to realize a $2,000,000.00 profit on property she held in Ohio if she could pay off back taxes. Over a two year period, she only repaid $5,000.00 despite constant urgings by Mr. Connally.
 
 Sufficiency Of The Evidence
 
 12
 The essence of a violation of 18 U.S.C.A. 2314 and 1343 is the act of devising a scheme or artifice to defraud by means of fraudulent or false pretenses. It is such a scheme, we assume, that appellant contends is unsupported by substantial evidence when in her brief she states that 'the evidence in this case conclusively shows a loan and not a theft.'[2] We think that there was more than sufficient evidence to support the jury's verdict. Such a scheme could be supported by the jury's belief that appellant lied in inducing Ms. McNiff and Ms. Harris to lend her money on the basis of a non-existent business deal involving non-existent property in Ohio. It could further be supported by the jury's belief that appellant offered as collateral $130,000.00 worth of stock she did not own and that appellant had in January of 1971, tricked her friend Robert Connally out of $25,000.00 by using the same bogus tales of a get-rich-quick land scheme as an inducement for the loan. Appellant's gross exaggerations of financial solvency, and her numerous evasions and half-truths concerning her ability to repay the loans all contribute to supporting the jury's verdict of guilt. That the jury chose not to believe appellant's testimony that Ms. McNiff and Ms. Harris volunteered to lend her their life's savings because they knew she was having financial problems, is well within their province as the ultimate triers of fact and can certainly not be said to be clearly erroneous. United States v. Davis, 5 Cir., 1971, 443 F.2d 560, cert. denied, 404 U.S. 945, 90 S.Ct. 298, 30 L.Ed.2d 260; United States v. Graves, 5 Cir., 1970, 428 F.2d 196, cert. denied, 400 U.S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269.
 
 
 13
 Affirmed.
 
 
 
 [1]
 1343. Fraud by wire, radio, or television.-- Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both
 2314. Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting.-- Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, Knowing the same to have been stolen, converted or taken by fraud; or
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more; . . .
 Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 
 
 [2]
 The appellant does not nor could she with justification urge that there was insufficient evidence to support the finding implicit in the guilty verdict that either the persons defrauded or the money obtained as a result of the fraud traveled in interstate commerce. 18 U.S.C.A. 2314, 1343