**Punt SISUNG and Gus Fitzgerald, Appellants,**

v.

**TIGER PASS SHIPYARD CO., Inc., Appellee.**

**No. 19346.**

United States Court of Appeals
Fifth Circuit.

May 16, 1962.

---

1. At the time of his plea of guilty, Igo was 20 years of age.

2. The motion was filed under the provisions of 28 U.S.C. § 2255.

Francis Emmett, New Orleans, La., for appellants.

William S. Stone, Paul A. Gaudet, New Orleans, La., for appellee.

Before HUTCHESON, WISDOM and BELL, Circuit Judges.

BELL, Circuit Judge.

This appeal is from the dismissal on the merits of a libel in personam brought by appellants, owners of the crewboat Rhea III, for damages to the vessel while it was moored at the shipyard of appellee.

The shipyard is located near Venice, Louisiana, on the east bank of Tiger Pass, which runs in a southeasternly direction from the Mississippi River to the Gulf of Mexico and is the sole establishment in that vicinity on the east side. It is located in the straight reach of the Pass which at that point is approximately two hundred feet in width. The docks and facilities of Humble Oil Company and others are opposite the shipyard on the west bank of Tiger Pass. There is heavy traffic in the Pass, both day and night.

The shipyard had a bulkhead running parallel to the bank of the Pass but no slips. The bulkhead was described as a retaining wall, and was six to eight feet out, the high ground gradually sloping into it.

The Rhea III was a white woodhull crewboat approximately thirty two feet in length and ten feet wide with a draft of three feet. She was jointly owned by appellants but was in the charge of Fitzgerald.

Appellant Sisung was president and majority stockholder in appellee Shipyard but was not active in the management of it. Appellant Fitzgerald at one time owned a twenty five percent interest in it but had sold out prior to the casualty with which we are here concerned.

Edwin Joseph Chauvin was vice president and manager of the shipyard while Antoine J. Cunningham was an employee living in a trailer one hundred fifty to two hundred feet from the Rhea III on the night of the casualty. These were the central characters on the trial, indeed the only witnesses.

The Rhea III was brought to the shipyard early in May for repairs and a month later, the repairs having been completed, Sisung visited the yard while she was still on blocks to inspect her. He approved the repairs and directed Chauvin to put her over in derrick slings for a sufficient time to be sure she was not leaking and then to moor her at the downstream end of the yard's bulkhead, considered by all to be the safest place at the yard for mooring.[1] He signed the repair invoice, directed Chauvin to notify Fitzgerald that she was ready and to request Fitzgerald to pick her up.

Chauvin, following these instructions, launched the vessel and held her in the derrick slings for a sufficient time for her underwater planking to swell and to make certain that she was not leaking. He then had her moored at the location selected by Sisung with her bowline secured to a willow stump on the bank. No stern line was used. She was headed up current, port side to the channel, snug against the bank with from one quarter to one half (two and one half to five feet) of her width extending channelward of the bulkhead. The velocity of the current was between five and seven miles per hour and sufficient according to the witnesses to hold a vessel, moored as she was with a bowline only, snug against the bank.

Between four thirty and five o'clock that afternoon Chauvin telephoned Fitzgerald that the Rhea III was ready and was moored downstream of the bulkhead and asked him to pick her up. Here appears the first conflict in evidence. Fitzgerald testified several times that he told Chauvin he could not pick the vessel up until the next day but on cross-examination he admitted that he was not certain of this. He admitted that he knew the vessel had been launched and that he intended sending for her that afternoon if he got around to it. He denied knowing exactly where she was moored. Chauvin denied the statement of Fitzgerald that he would not come for her until the next day but admitted that Fitzgerald stated to him that he could not come for the vessel until later. Chauvin left the shipyard immediately after the telephone conversation and left no instructions with anyone concerning the vessel.

Cunningham, an employee of two days duration at the shipyard, lived on the grounds in a trailer. He remained at the shipyard that evening but had no duties as a watchman. He helped moor the vessel that afternoon and saw her at eight thirty o'clock p. m. when she appeared to be in good condition with her starboard side flush against the bank. He went to bed about nine p. m. and between then and eleven p. m. was awakened by an unusual noise described by him as a "cracking sound". At eleven p. m. he got up and went outside to smoke a cigarette and go to the outside toilet. He saw that the Rhea III was leaning to port. He looked up and down the Pass for a vessel underway. He testified that he neither saw nor heard a vessel underway and went back to bed without making any further investigation.

Upon inspection the next morning it was discovered that she had been rammed by an unknown boat or object during the night and was pushed onto the bank. She was hit midship on the portside, almost cut in two, and was an agreed constructive total loss.[2]

There were no lights placed or lighted on the vessel but the derrick at the shipyard was equipped with three flood lights to illuminate the yard and these were

1. She could have been safely moored in one of the Humble slips but there was danger of pilfering.

2. This action was brought by appellants for their underwriters who had previously paid the loss.

kept burning day and night, one light being on the boom and one on each side of the derrick. They contained 300 and 500 watt bulbs. The testimony was that they lighted the whole working area of the shipyard and one threw light on the Rhea III and fifty feet beyond her. Cunningham testified that he could see her snug against the bank before he went to bed and leaning to port when he observed her at eleven although he was one hundred fifty to two hundred feet away from her. One of the lights was within seventy five feet of her.

Cunningham testified that on the previous two nights he had been awakened many times by noises from traffic in Tiger Pass. He testified that downbound vessels would frequently swing the heads of their tows into the bank of the wooded area a hundred feet or so below the shipyard so that the current would swing them about to head upstream and thereby facilitate entering the slips on the west bank of the Pass across from the shipyard.

Chauvin discovered the damage early the next morning. Sisung inspected the damage that morning. He testified that she was where he had directed Chauvin to moor her except that she had been forced up the slope of the bank. He was also a deputy sheriff and along with other deputies searched for the object that rammed the Rhea III but without success. Sisung also testified that he contemplated that Chauvin would moor her with a bowline only and that he considered the vessel to be at owner's risk when it was launched and moored according to his directions. Fitzgerald was familiar with the facilities at the shipyard, was in charge of skippers for this vessel and others and both Sisung and Fitzgerald knew that no night watchman was employed at the yard.

Appellants contend that appellee was the bailee of the Rhea III at the time of her destruction and failed to overcome the presumption or inference of negligence arising under such circumstances, and alternatively, that appellee was negligent in leaving the vessel in an exposed position on navigable waters, in improperly mooring her, and in leaving her moored without a watch aboard or in her vicinity, all of which negligence proximately contributed to the loss.

The trial court in a memorandum opinion stated that it did not find that the bailment ceased after the boat was launched and moored in accordance with the directions of Sisung and when Fitzgerald was notified of such action and gave no instructions for overnight care, but stated that the court would so hold if it was necessary so to do. We will dispose of this question first.

■ ■ Whether the bailment had ceased or not is relatively unimportant since the relation of bailor and bailee, *stricti juris*, was not necessary in order to impose the duty of reasonable care on the shipyard to protect the vessel still in its possession. New York Trap Rock Corporation v. Christie Scow Corporation, 2 Cir., 1947, 162 F.2d 624; C. F. Harms Company v. Erie Railroad Company, 2 Cir., 1948, 167 F.2d 562. Of course, there could have been constructive delivery to appellants through the action of Sisung in directing the mooring but his further instruction was to call appellant Fitzgerald and tell him to pick her up and Fitzgerald was at least unclear as to when he would send for her. Even assuming without deciding that the bailment had ended, we hold that there was a failure of the minds to meet on the time of delivery with the consequent duty on the shipyard, in the meantime, to use reasonable care in protecting the vessel as a part of the delivery. Continental Insurance Company v. Himbert, La.App., 1948, 37 So.2d 605. But this standard of care did not run to the place of mooring as we shall hereinafter discuss because it was moored there at the direction of Sisung.

■ ■ The rule in bailment cases is that the bailee may overcome the inference of negligence arising against it because of delivery in good condition and return in damaged condition by telling all that it knows of the casualty, and that it exercised ordinary care in all that

it did with respect to the vessel. This burden, unlike that of persuasion which rested at all times on appellants, simply required appellee to go forward with evidence sufficient to show that it had no more knowledge of the cause of the casualty than was available to appellants and that it exercised ordinary care. At this juncture the burden of going forward would shift back to appellants to ultimately persuade the trier of the facts of negligence on the part of appellee proximately causing the casualty. This rule as it applies to bailments is "but a particular application of the doctrine of *res ipsa locquitur*." Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 62 S.Ct. 156, 86 L. Ed. 89. And it is to be noted that this case also points out that a bailee is not an insurer. Cf. Indamer Corp. v. Crandon, 5 Cir., 1952, 196 F.2d 5.

As it happens the proof here is the same, whether it be of use of ordinary care by appellee to overcome the inference of negligence cast on it as a bailee, or to show negligence on the part of appellee, if the bailment rule is inapplicable, or to show negligence if it is applicable and the burden of persuasion has shifted back to appellants.

▮ The trial court made findings as to subsidiary facts and as to negligence and the use of ordinary care. And the findings of the trial court in Admiralty are binding on us, insofar as they relate to facts as distinguished from conclusions requiring the application of legal standards, unless clearly erroneous. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; C. J. Dick Towing Co. v. The Leo, 5 Cir., 1953, 202 F.2d 850. And we must approach the findings of fact by applying the rule that "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." McAllister, supra.

▮ The trial court found that the mooring of the vessel by only one line was sufficient in view of the undisputed current in the Pass sufficient to hold a boat tight against the bank. He found the lighting adequate, and denied the request to invoke The Pennsylvania rule, 1873, 86 U.S. 125, 22 L.Ed. 148, of presumptive negligence based on statutory violation, holding that Title 33, § 80.16a, Code of Federal Regulations, regulating lights on certain vessels to be inapplicable. He also denied the contention that there was a duty on appellee to provide a watchman. We affirm these findings and conclusions.

The trial court also found that the type of damage sustained by the vessel and the fact that she was struck midship and driven up on the bank demonstrated that she was not hit while floating out in the channel. He found that she was protruding slightly in the navigable stream beyond the bulkhead and there subject to the hazards of traffic including tugs permitting tows to hit against the wooded bank but that the physical damage did not suggest this type or cause of collision. On the issue of ordinary care he found that it was not unreasonable for appellee to have left the vessel where she was moored in view of the acts of piracy on the docks across the Pass and the fact that Fitzgerald might have called for the vessel after the yard was closed.

▮ While it is our opinion that the exercise of ordinary care required appellee, as the one in possession of the vessel as bailee or during delivery to have ascertained if the vessel would be left overnight, and to move it to a place of safety in the event it was to be left overnight, this failure here was not negligence in view of the undisputed fact that appellee moored the vessel exactly where it was instructed to moor it by appellant Sisung. The shipyard would be liable, even in the absence of negligence, in the event of damage if it had disobeyed this instruction. 6 Am. Jur., Bailments, § 228. Furthermore, where the owner maintains some dominion over the vessel, as Sisung did by selecting the place of mooring, there is a corresponding limitation on the duty

of the bailee or one in possession. Cf. Stegemann v. Miami Beach Boat Slips, Inc., 5 Cir., 1954, 213 F.2d 561.

Appellants, through Sisung, were the authors of their own misfortune and should not be permitted to recover. The judgment is

Affirmed.