**UNITED BARGE COMPANY, Appellee,**

v.

**NOTRE DAME FLEETING & TOWING SERVICE, INC., and Smitty's Harbor Service, Inc., Appellants, Cross-Appellees,**

v.

**INGRAM BARGE CO. and Ingram Corporation, Appellees, Cross-Appellants.**

Nos. 77–1259, 77–1292.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1977.

Decided Jan. 12, 1978.

---

600

Joseph M. Kortenhof, St. Louis, Mo., for
Notre Dame and Smitty's.

Fritz G. Faerber, St. Louis, Mo., for Ingram Barge.

Elmer Price, St. Louis, Mo., for United Barge.

Before HEANEY, WEBSTER and HENLEY, Circuit Judges.

WEBSTER, Circuit Judge.

This is an appeal from a judgment imposing liability upon appellants Notre Dame Fleeting & Towing Service, Inc., Smitty's Harbor Service, Inc., and Ingram Barge Company in connection with the sinking on January 10, 1973, of Barge DP–224. The District Court[1] awarded the barge's charterer, appellee United Barge Company, damages of $71,926.73. The Court also granted Ingram Barge's cross-claim for indemnification against Notre Dame and Smitty's and no appeal was taken from that order. We affirm.

Originating in Havana, Illinois, Barge DP–224 arrived in St. Louis harbor on January 5, 1973, loaded with 47,500 bushels of corn. Upon its arrival, the barge was delivered to Notre Dame's Arsenal Island Fleet where it was moored until it sank on January 10, 1973. During this period, heavy ice was floating in the Mississippi River, rendering navigation and maintenance of barges extremely hazardous. While the DP–224 was moored at Notre Dame's, ice began to accumulate under the barge's hull.

On January 9, 1973, four days after the barge had arrived, the National Weather Service and Corps of Engineers notified Notre Dame that the river would drop approximately four feet in the next twenty-four hours.[2] In response to the warning, Notre Dame closed its fleets to incoming barges and attempted to move the barges already on hand to deeper water. At about this time, Notre Dame became aware of the ice that had been building under the hull of the DP–224 and that the barge was aground on ice in about four feet of water.[3]

Notre Dame then employed the services of Smitty's to rescue and remoor the barge. Captain Smith, president of Smitty's, supervised the operations and hired the M/V O. H. Ingram, a tug boat, to remove the barge. After an unsuccessful attempt by the O. H. Ingram to "pull" the barge off ground, a wheelwashing process was employed. Water was produced from the Ingram's engines and directed underneath the barge in an effort to free her.[4] The District Court found that the water was aimed only at the barge's downstream end. As a result, large chunks of ice were washed out only from one-half of the barge thus removing the support on its downstream end. With its upstream half still hard on ice, the barge's own weight, together with that of the cargo, caused it to break in half. It immediately sank.

In this appeal, appellants allege that (1) the District Court erroneously held that appellee had established an unrebutted prima facie case under the maritime law of bailment, and (2) the District Court's findings of actual negligence were clearly erroneous.

I.

United Barge, charterer of the DP–224, delivered the barge for storage to the custody and control of Notre Dame. A bailment relationship was thus established,

---

1. The Honorable John K. Regan, United States District Judge for the Eastern District of Missouri.

2. In fact, the river dropped 5–8 feet in the next forty-eight hours. Appellants stressed the unprecedented nature of the river drop. Appellants' witness, Ralph Clark, a marine surveyor, testified that he had never seen the Mississippi drop that much in forty-eight hours. William Garner, a Notre Dame employee who testified on behalf of appellee, stated that he had seen the river drop more than four feet in twenty-four hours.

3. In a deposition taken by appellee, Captain Smith, President of Smitty's, opined that the ice had been building up for about a week.

4. The water was actually directed under the DP–257, which was also aground and was positioned next to the DP–224. The District Court found, however, that while the wash was directed under the DP–257, the washing operation was being conducted under the DP–224 as well.

*see Stegemann v. Miami Beach Boat Slips,* 213 F.2d 561, 564 (5th Cir. 1954).

■ The District Court found that Notre Dame had failed to rebut the inference of negligence arising when a seaworthy vessel is delivered to a bailee in good condition but is returned damaged.[5] Appellants contend this inference was rebutted by evidence of the extraordinary circumstances leading up to the damage, and in any event, Ingram was not a bailee and thus not subject to an inference of negligence. It is unnecessary for us to decide the inference of negligence issue[6] because the District Court made specific findings that each of the defendants failed to exercise ordinary care and that their negligence proximately caused the damage.

## II.

■ The findings of fact of a district court sitting without a jury in an admiralty case, while not explicitly reviewed under the "clearly erroneous" standard of Fed.R. Civ.P. 52(a), *see* Fed.R.Civ.P. 81(a), have been held to be reviewable under that standard, *see Guzman v. Pichirilo,* 369 U.S. 698, 702, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1961), *citing McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *Midland Enterprises v. Notre Dame Fleeting & Towing Service, Inc.,* 538 F.2d 1356, 1357 (8th Cir. 1976); *Movible Offshore, Inc. v. The M/V Wilken A. Falgout,* 471 F.2d 268, 271 (5th Cir. 1973); *Logan Charter Service, Inc. v. Cargill, Inc.,* 373 F.2d 54, 55 (8th Cir.

1967); *Travis v. Motor Vessel Rapids Cities,* 315 F.2d 805, 809 (8th Cir. 1963). "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *McAllister v. United States, supra,* 348 U.S. at 20, 75 S.Ct. at 8, *citing United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1947).

■ In determining whether the District Court's findings are clearly erroneous, we must construe the evidence in a light most favorable to the appellee. *Walker Transportation Co. v. Neylon,* 396 F.2d 558, 565 (8th Cir. 1968), *citing North American Van Lines, Inc. v. Brown,* 248 F.2d 905, 914 (8th Cir. 1957). This Circuit has held that a district court's conclusions on negligence are reviewable under the clearly erroneous standard. *See Massman Construction Co. v. Wayne B. Smith, Inc.,* 526 F.2d 242, 244 (8th Cir. 1975). *See generally* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2590 (1971).

## A.

■ The District Court found that Notre Dame should have become aware of the ice build-up under the barge's hull in time to have taken preventive action.

■ While not an insurer of the barge's safety, *see Dow Chemical Co. v. Barge UM-23B,* 424 F.2d 307, 311 (5th Cir. 1970); *Si-*

---

**5.** A bailment imposes upon the bailee a duty of ordinary care. *Massman Construction Co. v. Wayne B. Smith, Inc.,* 526 F.2d 242, 244 (8th Cir. 1975); *Stegeman v. Miami Beach Boat Slips,* 213 F.2d 561, 564 (5th Cir. 1954). When a barge is delivered to a bailee in good condition but is returned damaged, an inference arises that the bailee is responsible for the damage caused. Once the bailment relationship is established and the bailor proves the vessel was "seaworthy" when delivered, the bailee will be found liable for the damage to the vessel unless he comes forward with evidence that the damage resulted from causes or circumstances other than from his own negligence. *See United States Fire Insurance Co. v. Brokamp & Bressler, Inc.,* 296 F.2d 81, 82–83 (6th Cir. 1961); *Richmond Sand & Gravel Corp.*

*v. Tidewater Construction Corp.,* 170 F.2d 392, 393 (4th Cir. 1948). *See also Mid-America Transportation Co. v. St. Louis Barge Fleeting Service, Inc.,* 229 F.Supp. 409, 412 (E.D.Mo.), *aff'd per curiam,* 348 F.2d 920 (8th Cir. 1964).

**6.** The application of an inference of negligence to bailees is more appropriate when the circumstances are in doubt, such as a breakaway. The burden of producing evidence is then cast upon the bailee because he is generally in a better position than the bailor to know the cause of the loss and to show it was one not involving the bailee's liability. *Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 111, 62 S.Ct. 156, 86 L.Ed. 89 (1941).

*sung v. Tiger Pass Shipyard Co.,* 303 F.2d 318, 322 (5th Cir. 1962); *cf. Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 110, 62 S.Ct. 156, 86 L.Ed. 89 (1941) (vessel carrying goods not an insurer of their safety), Notre Dame concedes that as a fleeting operator, it had a basic responsibility to care for the barges in its custody.

The District Court found, and the parties do not dispute, that the river conditions in the St. Louis Harbor were hazardous between January 5, when the barge was delivered, and January 10, the date of the accident. Despite the abnormally heavy flow of ice, however, the barges were not inspected until January 9, when the Corps of Engineers notified Notre Dame of the expected drop in the river.

Appellants argue that an inspection would have been extraordinary under the circumstances because the barge could only have been adequately inspected if a diver had been utilized, an unlikely proposition. The testimony indicated, however, that proper sounding might have exposed the accumulated ice. We cannot say this negligence finding by the District Court is clearly erroneous. *Cf. Monsanto Co. v. Port of St. Louis Investments, Inc.,* 350 F.Supp. 502, 519–20 (E.D.Mo.1972), *aff'd per curiam,* No. 72–1689 (8th Cir. Oct. 19, 1973) (failure to inspect moorings to determine their adequacy held negligent when barge broke loose).[7]

**B.**

The District Court also found that, in their attempt to free the barge, appellants conducted the wheelwashing process in a negligent manner.

After an aborted effort to pull the DP–224 off ground, Smitty's and the O. H. Ingram attempted to free the barge by wheelwashing. The water was directed under the downstream end of the DP–224. This, the Court found, effectively loosened large chunks of ice from the barge's downstream end and removed the barge's support. With its upstream end still hard on ice, the weight of the barge caused it to break in half. The Court also found that Smitty's and the O. H. Ingram failed to make periodic inspections during the wash process to determine the effect the wash was having. In short, the Court held that the failure to direct the washing operations along the entire length of the barge, together with the omission of any inspections during the course of the wheelwashing, constituted negligence.

According to the record, no inspection was made prior to the wheelwashing other than some casual spike-poling. Captain Bowman testified that these inspections, which were limited to the barge's downstream end, were inadequate. In his view, before commencement of the washing, an all-around inspection should have been made and the barge should have been completely sounded. Nor did appellants inspect the barge during actual operation of the wheelwashing. Among the experts, Captain Smith testified that by walking out on the barge, one can tell how far upstream the wheelwashing is going by examining the amount of bubbling water that appears. Captain Barnes testified that he would have had a man out on the barge with a walkie talkie carefully listening for any movement and assisting in the direction of the washing operation. Captain Bowman would have had someone out on the barge to determine whether any ice was emerging from beneath the barge. He would have systematically sounded the sides of the barge to determine whether the wheelwashing was having any effect. He criticized appellants' failure to make any inspections during the washing process. Forty minutes of wheelwashing with a 4300 horsepower

---

7. Appellants rely on *Richmond Sand & Gravel Corp. v. Tidewater Construction Corp., supra,* in which a bailee successfully offered proof that it had exercised ordinary care. In that case, however, which dealt with a capsized vessel, the evidence showed that the bailee's employees had made frequent inspections of the vessel from the time it came into the bailee's possession until the time a leakage was discovered. Unlike the bailee in that case, appellants made no inspection whatever of the DP–224 from January 5 to January 9 despite hazardous river conditions, which according to appellants' experts, were unprecedented.

vessel is a rather long time to wash without inspection.

■ Captain Bowman further testified that the actual washing process was not performed with reasonable care.[8] In his view, appellants did not adequately utilize the current and improperly positioned the O. H. Ingram.

Q. Where would you have positioned the Ingram . . .?

A. I would have brought the Ingram up with her stern at the upstream end of the unidentified barge . . . and tied her in with the bow downstream and the stern abreast of the upstream barge and then reversed my engines and that way you would have washed the length of the barge and also utilized your rudder power to force the barge out.

The evidence also shows that no attempt was made to lighten the barge before commencement of the washing process. It is clear, as the District Court found, that the barge's weight, including that of the cargo, was an important factor ultimately causing the barge to break.

■ When evidence is contradictory and disputed, as it was in this action, an appellate court may not substitute its judgment for that of the trial judge. *See Parham v. Pelegrin*, 468 F.2d 719, 722 (8th Cir. 1972); *S. S. Omnium Freighter v. North-*

*west Marine Ironworkers, Inc.*, 341 F.2d 420, 423 (8th Cir. 1965); *Travis v. Motor Vessel Rapid Cities, supra*, 315 F.2d at 811. While in this case, the time pressure may have rendered the entire process more difficult and concomitantly more hazardous, substantial evidence supports the District Court's finding that appellants fell short of the ordinary care reasonably required under the circumstances.[9]

We affirm the judgment of the District Court.

---

**8.** Appellants stress that wheelwashing is customarily employed when a barge cannot be rescued by direct pull. The experts agreed that wheelwashing is an ordinary and proper method of operation. A party is not relieved from a charge of negligence, however, "merely because he has done what is customarily done, if what is customarily done amounts to a failure to exercise reasonable care under the circumstances of the particular case." *Tebbs v. Baker-Whiteley Towing Co.*, 271 F.Supp. 529, 535 (D.Md.1967), *aff'd*, 407 F.2d 1055 (4th Cir. 1969).

**9.** Appellants rely on *M. P. Howlett, Inc. v. Tug Michael Moran*, 425 F.2d 619 (2d Cir.), *cert. denied*, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970), in which plaintiff's barge capsized while in the possession of defendant's tug boat. A divided panel of the Second Circuit reversing the district court's finding of negligence, held that the tug could not be responsible for its failure to do what certain of plaintiff's witnesses testified it ought to have done. The Court

stressing the emergency the tug faced, applied a different standard and stated, "When faced with an emergency, negligence does not flow from mere error of judgment." *Id.* at 623. Here, on the other hand, the evidence was consistent that despite the river conditions, appellants failed to make any meaningful inspections which according to the experts could, and should have been made. Moreover, the District Court questioned Ralph Clark, appellants' expert, about the feasibility of alternately washing both ends in order to avoid removing the barge's support from one end. The Court received an inadequate response. Although somewhat ambiguous, it appears that the wash could have been conducted at the barge's midship in a concave manner. In short, the experts were not second guessing appellants in hindsight, but merely indicated what they thought would have been consistent with reasonable care under the circumstances. The District Court accepted such testimony.