**FRICHELLE LIMITED,**
et al., Plaintiffs,

v.

**MASTER MARINE, INC., Defendant.**

No. Civ.A. 97–0541–AH–S.

United States District Court,
S.D. Alabama,
Southern Division.

June 7, 2000.

Derek A. Walker, New Orleans, LA, Ray M. Thompson, Hawkins & Thompson, LLC, Mobile, AL, for Frichelle Limited, plaintiff.

Ray M. Thompson, Hawkins & Thompson, LLC, Mobile, AL, William J. Riviere, New Orleans, LA, Robert P. McCleskey, Phelps Dunbar, L.L.P., New Orleans, LA, for Certain Underwriters at Lloyd's London, and Certain Insuring Companies Subscribing to Master Yacht Cover, Cover, plaintiff.

A. Clay Rankin, III, Douglas W. Fink, Hand Arendall, L.L.C., Mobile, AL, John P. Kavanagh, Jr., Pierce, Ledyard, Latta & Wasden, P.C., Mobile, AL, for Master Marine, Inc., defendant.

## MEMORANDUM OPINION AND ORDER

HOWARD, Senior District Judge.

This matter came on for trial before the Court on February 7–11, 2000. Excerpts from several depositions were submitted to the Court following presentation of live testimony, which excerpts the Court has reviewed, as well as all exhibits introduced as evidence. The Court heard closing argument on May 18, 2000. The record is now closed and the case ripe for resolution. For the reasons that appear below, the Court finds that the defendant is entitled to judgment in its favor on the claims of the plaintiffs and on its counterclaim.

### PARTIES AND CLAIMS

The present controversy arises out of a casualty that occurred in July 1994 to the M/Y SHANGO (hereinafter, "the vessel") while in dry dock at the facilities of the defendant Master Marine, Inc. (hereinafter, "Master Marine"). The vessel is owned by the plaintiff Frichelle Ltd. (hereinafter, "Frichelle"), which carried hull insurance with the plaintiffs Certain Underwriters at Lloyd's, London and Certain Insuring Companies Subscribing to Master Yacht Cover No. Y0015989R (hereinafter, "Certain Underwriters").

Certain Underwriters paid Frichelle $835,000 in full settlement of its claim for damage to the vessel, and Certain Underwriters seeks to recover in excess of $900,000 from Master Marine. Frichelle, conceding that it has been made whole by its insurers for damage to the vessel, seeks instead to recover over $3,000,000 for loss of charter hire. Master Marine seeks to recover from Frichelle the sum of $25,995 as additional sums due and owing as a result of work performed on the vessel by Master Marine in July 1994, plus interest, costs and attorney's fees.

### FINDINGS OF FACT

The SHANGO is a fiberglass motor sailer built in 1976 by Cheoy Lee Shipyard, Ltd, Hong Kong. The vessel was originally built and classed according to the Lloyd's Register of Shipping (Cross of Malta 100 A. –1) and was designed to meet Lloyd's standards for such classification as they then existed.

Frichelle is a British entity that purchased the vessel sometime prior to March 1992. The vessel is Frichelle's only asset. Alfredo Beracasa ("Beracasa") purchased the shares of Frichelle in March 1992. The majority of the shares of Frichelle are held by Beracasa.

Frichelle purchased the vessel for $900,000 and invested several hundred thousand dollars in the vessel. Frichelle placed hull insurance with Certain Underwriters, with the September 3, 1993 cover note indicating the vessel and all her appurtenances were valued at $1,260,000.

Master Marine is an Alabama corporation engaged in ship repair and new construction. It is regularly employed by the United States Coast Guard, United States Navy and others to dry dock and repair various types of vessels, including fiberglass vessels. Master Marine uses two floating dry docks to raise vessels from the water. To raise a vessel using the subject dry dock, its wing tanks are flooded so as to sink the dock; the vessel to be raised is maneuvered into the dock and pumps are activated to de-water the tanks and lift the dock and the vessel.

Keel blocks are heavy wooden timbers that are spaced at intervals underneath a vessel's keel to bear the weight of the vessel to be lifted. Master Marine uses cables attached to cleats or bitts on the vessel deck for the purpose of keeping the vessel level and preventing it from listing to port or starboard as it is lifted and afterwards. After the dry dock is fully raised, Master Marine places bilge blocks along the turn of the vessel's bilge or chine areas, a total of two pairs of bilge blocks. Master Marine uses keel blocks to support the weight of the raised vessel. It uses cables and bilge blocks, not to support the weight of the vessel but to secure it from tipping or listing.

Prior to a Coast Guard or Navy vessel being lifted by Master Marine, a dry docking plan must be prepared by Master Marine and reviewed by a professional engineer. Coast Guard or Navy officers then review the dry docking plan before giving their approval for the lift to proceed. Master Marine lifts government vessels the same way it lifts private vessels, and it lifts fiberglass vessels, both government and private, the same way it lifts steel and wooden vessels.

The vessel has eight tanks. Tanks No. 1 through 7 consist of a pair of tanks each, port and starboard. Beginning at the bow, Tanks No. 1, 2 and 3 are not used. Tanks No. 4 and 5 are used for fuel, and Tank No. 6 is used for water. Tank No. 7 consists of two wing tanks that accept fuel from other tanks. Tank No. 8 is used for dry storage only. The outboard edge of the fuel and water tanks is the vessel hull. Tanks No. 4 and 5 have a combined total capacity of approximately 21,000 to 22,000 gallons. Tank No. 6 has a capacity of 6,000 gallons. Tank No. 7 has a capacity of 2,200 gallons.

The vessel has two inboard longitudinal bulkheads and two outboard, or swash, bulkheads. She also has a number of transverse bulkheads. In addition, she has a number of fiberglass stringers or stiffeners, both longitudinal and transverse, that provide rigid backing and are intended to support the hull. These stiffeners were installed as part of the original manufacture of the vessel. The stiffeners and bulkheads were attached to the hull with a "secondary bond." A secondary bond is required when the fiberglass has already cured so that a primary bond (in which a subsequent laminate can polymerize at a molecular level to the previous laminate) cannot be accomplished. While a primary bond is chemical in nature, a secondary bond is in the nature of a mechanical attachment similar to glue.

In approximately 1991 or 1992, certain portions of the stiffeners, primarily in the port No. 4 tank, debonded. Measured in linear feet, the debonded members represented approximately 4.1% of the total length of the stiffeners and bulkheads. The tank was not subsequently gas-freed, and the damage went undetected prior to the July 1994 casualty.

The vessel was first dry docked at the Master Marine facility in April 1994. She was dry docked using Master Marine's normal procedure outlined previously. At the time of the dry docking, and throughout the time she was in dry dock, she carried approximately 4,500 to 5,000 gallons of fuel. She remained dry docked without incident for approximately one month.

The April 1994 dry docking was for the purpose of allowing Master Marine to in-

stall an owner-furnished bow thruster unit and to clean, sandblast and paint the vessel with owner-furnished anti-fouling paint. During the April 1994 dry docking, representatives of Master Marine discovered approximately 200 previously patched areas of the hull, as well as numerous blisters, some of which were weeping. Captain Wager had wanted a barrier system applied to seal out moisture on the exterior hull. However, a manufacturer's representative tested the vessel with a moisture meter and stated that the vessel was "too wet" to guarantee the product, which was not applied.

After being refloated, the vessel remained at the Master Marine facility until June 24, 1994 so that the captain and crew could perform miscellaneous jobs on the vessel. The vessel then sailed to Pensacola and from there to Key West.

After problems developed with the bow thrusters, the vessel returned to the Master Marine yard on or about July 8, 1994. The vessel sat afloat for approximately one week before she was dry docked on July 15, 1994. The vessel was dry docked in the same manner as was used in April 1994. The purpose of the July 1994 dry docking was restricted to correction of the bow thruster problem.

The vessel carried 4,500 to 5,000 gallons of fuel when she left the Master Marine dry dock following the April 1994 dry docking. She then took on 9,200 gallons of fuel purchased from Master Marine. Between travel and use of her generators while lying at anchor, she consumed approximately 6,500 gallons prior to the July 1994 dry docking.

On July 18, 1994, the vessel's crew painted her bottom. Between July 15 and July 19, 1994, several crew members remained on the vessel and kept it secured with locks. Master Marine representatives were not free to enter the vessel without permission from the vessel's crew. Master Marine did not have exclusive right of possession of the vessel during this period.

On July 19, 1994, it was discovered that fuel and water had escaped their tanks. Approximately 9,000 gallons of fuel and water were removed from the vessel and several inspections ensued. Measured in linear feet, 24.3% of the stiffeners and bulkheads were debonded, with 4.1% representing old damage and 20.2% representing recent damage. Certain transverse bulkheads were partially crushed as a result of the separation, as the upward force of the keel pressed against them.

■ Each party relied at trial on the testimony of an expert witness.[1] The Court finds the testimony of Master Marine's expert, Robert Schofield, to be more credible and accepts his testimony over that of the plaintiff's expert, Albert Horsmon. Without being exhaustive, the Court can readily identify several factors supporting its credibility finding.

First, the Court notes that Mr. Schofield's qualifications are significantly greater and significantly more relevant than those of Mr. Horsmon. For example, while both witnesses are naval architects, only Mr. Schofield has a degree in marine engineering. While Mr. Horsmon has never been tasked to assess whether a vessel may be safely dry docked, Mr. Schofield

---

1. David Jones is the president and owner of Sigma Labs, which tested samples from the vessel and contracted out chemical analysis to Spectralab. In the amended pretrial order, both parties identified Jones as a fact witness and not as an expert witness. However, the parties agreed that Jones "is an expert qualified in all respects to comment on the test results completed by Sigma Labs." (Doc. 71 at 17) The plaintiffs argue that this statement allows them to offer Jones as an expert on a wide range of matters, (Doc. 86 at 9–12), but an agreement that an individual is qualified to express certain expert opinions is not an agreement that he may express other expert opinions or that the plaintiffs need not comply with the Court's order concerning identification of experts and their testimony. Accordingly, the Court has previously ruled that Jones may testify as an expert only with respect to commenting on Sigma's test results. (Doc. 91)

spent several years in private industry performing calculations necessary for dry docking vessels, including damaged ones. While both Mr. Horsmon and Mr. Schofield advise shipyards in repair and new construction of fiberglass vessels, Mr. Schofield was chief designer on a 154–foot fiberglass minesweeper project and performed structural design for 130– to 150– foot motor yachts and a 108–foot fiberglass commercial fishing vessel. Mr. Schofield has also developed computer programs for fiberglass power boats that have been used by shipyards in connection with the construction of thousands of vessels.

Similarly, while Mr. Horsmon has taught a six-hour course on composite boat design and construction (including both fiberglass and other materials), Mr. Schofield has taught a 40–hour course restricted to the technical detail of fiberglass vessels, a course Mr. Horsmon attended as a student. While Mr. Horsmon has authored a handful of relevant articles, Mr. Schofield has authored many more and has also presented numerous papers on fiberglass construction and repair. While Mr. Horsmon has never testified as an expert on fiberglass construction or repair, Mr. Schofield has done so numerous times.

Second, Mr. Schofield was able to support his opinions with more detailed analysis than was offered by Mr. Horsmon. Mr. Schofield's opinions were typically supported by mathematical calculations and/or first-hand experience and knowledge, while Mr. Horsmon's opinions were typically based on vague recollections of general information from casual sources he could not recall.

Third, Mr. Schofield testified in person and the Court was able to confirm his credibility based on its observations of his demeanor as well as his command of the subject. Moreover, the Court was able to, and did, ask Mr. Schofield additional questions not addressed by counsel. Mr. Horsmon's testimony, in contrast, was presented by deposition.[2]

At the time of the July 1994 dry docking, the vessel was not in good condition and was not seaworthy. The secondary bonds securing the stiffeners and bulkheads to the hull were improperly made, weakening the bond and allowing for separation under stresses that a proper secondary bond would tolerate. Over 4% of the linear feet of the stiffeners and bulkheads had previously become debonded. This debonding increased the stress concentrations around the boundary of the separated area, increasing the likelihood of further failure. The initial poor secondary bond and the debonding that occurred prior to the July 1994 dry docking resulted in the unseaworthiness of the vessel, and such unseaworthiness was the direct and proximate cause of the July 1994 casualty.

Fiberglass vessels do not, by virtue of their composition, require additional or special precautions when being dry docked. A properly designed and constructed fiberglass vessel should easily withstand the stress of dry docking, even with full tanks, and the SHANGO was so designed. Competent naval designers do not even separately consider the forces encountered in dry docking with full tanks because those forces are a small fraction of the sea forces the vessel must be designed to withstand. In this case, to obtain her Lloyd's classification in 1976, the vessel had to be designed to withstand sea loads in excess of eight pounds psi, while the stresses of full fuel tanks amounted to approximately 2.5 pounds psi.

The vessel's fuel tanks were not full at the time of the casualty. Her No. 4 and No. 5 fuel tanks had a capacity of 21,000 to

**2.** At closing argument, plaintiffs' counsel studiously avoided reference to Mr. Horsmon's testimony. Instead, counsel for Frichelle suggested the Court has committed reversible error by rebuffing the plaintiffs' efforts to admit opinion testimony by deponents never identified as experts in the parties' Rule 26 disclosures or in the pretrial order. As discussed in the Court's conclusions of law, the Court has properly excluded such testimony.

22,000 gallons but were carrying no more than approximately 7,200 to 7,700 gallons. The resulting stress was therefore less than the approximately 2.5 pounds psi they would have been had the tanks been full.

The Coast Guard and Navy dry dock fiberglass vessels at Master Marine without any requirement that tanks be emptied or that additional bilge blocking be used or used differently. There is no Coast Guard or Navy requirement of such additional or special precautions when dry docking fiberglass vessels. To the extent that certain other shipyards may take different precautions when dry docking fiberglass vessels, these precautions do not reflect an industry standard and are not required by the characteristics of fiberglass vessels.

An 18–year old fiberglass vessel does not, by virtue of her age, require additional or special precautions when being dry docked. Older fiberglass vessels are not, by virtue of their age or the design or manufacturing processes then in place, weaker than newer fiberglass vessels and often are more massively built.

The blisters on the vessel's hull, and the milky white discoloration of the hull samples noted by Sigma Labs, resulted from hydrolysis of seawater. The debonding of the interior members was not caused by hydrolysis but by poor secondary bonding. The former problem does not cause, or suggest the existence of, the latter. Neither such blisters nor whitish laminate in the hull would put a reasonably prudent dry dock on notice that the vessel's internal support members are or may be unable to tolerate the stress of dry docking.

Nor would evidence of hydrolysis put a reasonably prudent dry dock on notice that the hull itself may not withstand the stress of dry docking. A Coast Guard study found only three instances of structural failure directly related to blistering out of tens of thousands of blistered vessels.

The purpose of keel blocks is to support the weight of the vessel. The number and placement of keel blocks used in connection with the July 1994 dry docking was adequate and proper for their intended purpose.

The purpose of bilge blocks, both at Master Marine and in general, is not to support the hull but to provide a second means (in addition to cables) of preventing tipping or listing of the vessel while in dry dock. While certain design guidelines call for bilge blocks to be able to support 15% of the vessel's weight, this parameter reflects only that, if the vessel does tilt or list, the bilge blocks must be capable of supporting some of the vessel's weight until the vessel is righted. The number and placement of bilge blocks used in connection with the July 1994 dry docking was adequate and proper for their intended purpose.

No representative of the vessel informed any representative of Master Marine of the amount of fuel or water on board the vessel or requested that it be discharged, and no representative of Master Marine agreed to do so. No representative of the vessel informed any representative of Master Marine of any known or suspected problem with the integrity of the vessel or expressed any concern or question about her ability to withstand the stresses associated with dry docking. No representative of Master Marine inspected the vessel's fuel tanks, water tanks, bulkheads, stiffeners, bilge or other interior areas of the vessels. No representative of the vessel informed any representative of Master Marine that there was fuel in the vessel's bilge. No Master Marine representative knew or should have known of any deficiency in the integrity of the vessel's internal support members.[3]

The Court is of the opinion that, if the vessel had been dry docked at Master Marine in July 1994 for the purpose of

---

**3.** The Court has considered the evidence and argument offered by the plaintiffs to the contrary, including the testimony of Captain Wa-

ger, but finds the evidence of Master Marine to be more credible.

inspecting the structural integrity of the vessel or repairing damage to her structural support members, Master Marine would have been obligated to gas-free the vessel's fuel tanks prior to dry docking and to make an inspection to determine the integrity of the vessel's internal support members. With knowledge that the structural integrity of the vessel was in question, Master Marine would have been obligated to "cradle" the vessel's hull before raising her out of the water. Under the circumstances of this case, however, Master Marine was not put on notice of any structural weakness with respect to the integrity of the hull of the vessel and its supports and, in fact, neither the vessel owners nor anyone else had any knowledge of such a problem. Therefore, Master Marine neither knew, nor with reasonable diligence should have known, of the vessel's structural failures and deficiencies which existed prior to the July 1994 dry docking, and Master Marine was under no obligation to treat the SHANGO as a "sick" vessel.

Master Marine's dry docking of the vessel constituted reasonable care under the circumstances. Master Marine did not know of any problem concerning the integrity of the vessel's internal support members and neither was aware nor should have been aware of any facts concerning the vessel or fiberglass vessels in general that placed upon it a duty either to take additional or special precautions or to inquire further concerning the need to do so.

On the contrary, the vessel had completed a month-long dry docking without incident barely two months earlier. Absent any report from representatives of the vessel that the circumstances had meaningfully changed, Master Marine could not reasonably have anticipated any need to alter its dry docking procedures from the earlier, successful dry docking.

The only difference in the circumstances between the April and July dry dockings identified by the plaintiffs is the amount of fuel being carried by the vessel. Even had representatives of the vessel informed representatives of Master Marine concerning the amount of fuel on board, and even if the vessel's representatives had reported the exaggerated figure testified to by Captain Wager, such information would not have imposed on Master Marine any duty to take additional or special precautions or to inquire further as to the need for them. As noted previously, even full tanks do not impose sufficient stress on a properly designed and constructed fiberglass vessel to require additional or special precautions.

In view of the Court's finding that Master Marine was not at fault, the Court has no obligation to make findings with respect to damages. However, the Court does find that the vessel owner has failed to meet its burden of proving with reasonable certainty that profits had actually been, or may reasonably supposed to have been, lost.

Frichelle did not lose any profits from charter hire as a result of the casualty because the Court finds that Frichelle would not have availed itself of the opportunity of chartering the vessel. While some of the repairs and improvements made to the vessel are consistent with an intent to charter, they are equally consistent with an intent to use the vessel as a private pleasure craft. While Mr. Beracasa made inquiries regarding charter possibilities, as of trial in February 2000, Mr. Beracasa had owned Frichelle for just under eight years yet had chartered the vessel only one week, and never since the July 1994 casualty.

Master Marine billed Frichelle the amount of $75,995.99 for services rendered in connection with the casualty. Frichelle paid Master Marine $50,000.00 as part of an agreement allowing the vessel to be removed without in rem seizure. Frichelle's payment paid in full the amounts due and owing under Invoice Nos. 1794, 1797 and 1801. The principal amount of $25,995.99 remains due and owing to Master Marine.

**1344**

### CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333. Venue is proper in this Court.

The amended pretrial order lists the plaintiffs' theories as breach of contract and breach of duty. (Doc. 71 at 2) However couched, the plaintiffs' claims proceed on the theory, as expressed by counsel at closing argument, that Master Marine failed to exercise "reasonable care under the circumstances." Thus, "[t]he Court's inquiry as to each claim is similar. The main difference between the [two] claims is in the allocation of the burdens of production of evidence...." *Complaint of Lady Jane, Inc.*, 818 F.Supp. 1470, 1476 (M.D.Fla.1992). The allocation most favorable to the plaintiffs arises with respect to a claim for breach of a contract of bailment; if that theory fails, Master Marine necessarily prevails on any theory of negligence.

The plaintiffs assert that Master Marine was the vessel's bailee at the time of the casualty. "When a vessel is placed at a wharf or dock for storage and/or repairs, a bailment results for the mutual benefit of the owner of the vessel and the operator of the wharf or dock." *Stegemann v. Miami Beach Boat Slips*, 213 F.2d 561, 564 (5th Cir.1954). Under this definition, a bailment existed at the time of the casualty because the vessel was placed at Master Marine's dry dock for repairs.

Master Marine, citing the new Fifth Circuit's opinion in *T.N.T. Marine Service, Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585 (5th Cir.), *cert. denied*, 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983), argues that no bailment existed because it did not have exclusive right to possession of the vessel. The *T.N.T. Marine Service* Court did note that "[i]t has

been stated that an admiralty bailment does not arise unless the delivery to the bailee is complete and he has exclusive right to possession of the bailed property, even as against the owner." *Id.* at 588. However, the only case relied upon by the *T.N.T. Marine Service* Court for this proposition did not involve the delivery of a vessel to a dry dock for repair or dry dock storage but to a marina for docking space. *See Continental Insurance Co. v. Washeon Corp.*, 524 F.Supp. 34, 35 (E.D.Mo.1981).[4] Moreover, the *Continental Insurance* Court cited only Missouri precedents, not federal ones, for the proposition that a bailment requires exclusive right of possession. *Id.* at 36.

The *Stegemann* Court evidently did not consider the lack of exclusive possession to defeat a bailment, but rather viewed it as modifying the bailment and its resulting obligations: "Where the delivery of the thing is not complete, as when the owner remains with the thing or has an independent agent or employee responsible for it or for certain aspects of its care, there is a corresponding limitation on the bailment and the duty of the bailee." 213 F.2d at 565. In light of this language, the Fifth Circuit could not have believed that a nonexclusive right in and of possession of itself precludes a bailment from being established.

Similarly, Judge Brown in *Isbell Enterprises, Inc. v. Citizens Casualty Co.*, 431 F.2d 409 (5th Cir.1970), termed the repair yard's status one of bailee even though the vessel owner allowed a crew member to remain on board, pump the vessel and guard it. *Id.* at 414, 416 (bailment existed even though it "was not one giving [the repair yard] temporary complete dominion and control over the vessel").

4. *See Royal Insurance Co. v. Marina Industries, Inc.*, 34 Mass.App.Ct. 349, 611 N.E.2d 716, 717 & n. 2 (1993), *review denied*, 415 Mass. 1105, 616 N.E.2d 469 (1993) (distinguishing *Stegemann* from *Continental Insurance* on this basis). *Cf. Commercial Union Insurance Co. v. Bohemia River Associates, Ltd.*, 855 F.Supp. 802, 805 (D.Md.1991) ("[T]he exclusive control requirement has been relaxed somewhat when the owner of the boat has access to it in dry storage....").

■ Accordingly, the Court concludes that, under the binding precedent of *Stegemann* and *Isbell Enterprises*, a bailment existed at the time of the casualty in this case.[5] As discussed below, however, the plaintiffs have failed to carry their burden of proof whether or not Master Marine is accorded the status of bailee.

The standard of care imposed by a bailment is the same as exists in its absence. *Compare Stegemann v. Miami Beach Boat Slips*, 213 F.2d at 564 ("Unless stipulated otherwise, such a bailment imposes upon the bailee the duty of ordinary care.") *with Sisung v. Tiger Pass Shipyard Co.*, 303 F.2d 318, 321 (5th Cir.1962) ("[T]he relation of bailor and bailee ... was not necessary in order to impose the duty of reasonable care on the shipyard to protect the vessel still in its possession."). The significance of a bailment is that it allows the plaintiff to raise a presumption of negligence that the defendant must then rebut, as follows.

■ "[B]y proving that the vessel was delivered to the bailee in good condition and damaged while in his possession, the bailor makes out a prima facie case of negligence." *Stegemann v. Miami Beach Boat Slips*, 213 F.2d at 564. At this point, "the duty then devolves upon the bailee to go forward with the evidence and show affirmatively that he exercised ordinary care." *Id.* The plaintiff-bailor retains the burden of persuasion throughout so that, if the defendant's case leaves the evidence of negligence in equipoise, the plaintiff must

lose. *Id.* (quoting *Commercial Molasses Corp. v. New York Tank Barge Corp.*, 314 U.S. 104, 111, 62 S.Ct. 156, 86 L.Ed. 89 (1941)). The bailee may meet its burden by showing either that it exercised reasonable care or that its negligence was not a proximate cause of the plaintiff's damage. *Complaint of Lady Jane*, 818 F.Supp. at 1477.

Because Master Marine did not have exclusive right to possession of the vessel, "there is a corresponding limitation on the bailment and the duty of the bailee." *Stegemann v. Miami Beach Boat Slips*, 213 F.2d at 565. It is unnecessary to determine what form such a limitation should take because, even with no limitation, the plaintiffs have not satisfied their burden of proof. *Cf. Sisung v. Tiger Pass Shipyard*, 303 F.2d at 322 (the result would be the same whether or not a bailment existed).[6]

■ To establish a prima facie case of negligence by a bailee, the bailor must prove the vessel was delivered "in good condition." *Stegemann v. Miami Beach Boat Slips*, 213 F.2d at 564. Other cases have equated "good condition" with "seaworthy." *E.g., United Barge Co. v. Notre Dame Fleeting & Towing Service, Inc.*, 568 F.2d 599, 602 n. 5 (8th Cir.1978). The Court has previously found that the vessel was not in good condition and was not seaworthy when delivered to the defendant in July 1994. The Court has further found that such unseaworthiness was the direct and proximate cause of the damage to the

5. This is not to say that a vessel owner's control over the vessel could never be so invasive as to preclude a bailment from arising. It is sufficient for present purposes to note that the right of access to the vessel retained by the plaintiffs' representatives in this case does not approach the degree of invasiveness that would be necessary to defeat a bailment.

6. Fifth Circuit cases suggest, but do not expressly mandate, that the "corresponding limitation" on the bailee's duty should reflect the closeness of connection between the casualty and the vessel owner's retained right of con-

trol. *See Isbell Enterprises v. Citizens Casualty*, 431 F.2d at 416 (when a crew member staying on the vessel removed it from the repair yard and ran it aground, "the bailment obligation ... is modified to the extent the owner ... appears to reserve ... some operational control over the activity which operationally inflicts the harm"); *Sisung v. Tiger Pass Shipyard*, 303 F.2d at 322–23 (where the owner instructed the repair yard where to moor the vessel and the vessel was thereafter struck and damaged, "there is a corresponding limitation on the duty of the bailee or one in possession").

vessel while in dry dock. Accordingly, the plaintiffs have not shifted to Master Marine the burden of affirmatively showing that it exercised ordinary care.

Even had the plaintiffs successfully shifted the burden to Master Marine, it has affirmatively shown that it exercised reasonable care, and the plaintiffs have not carried their ultimate burden of persuading this Court, by a preponderance of the evidence, that negligence by Master Marine proximately caused the vessel's damage.

As noted, plaintiffs' counsel acknowledges that Master Marine's duty was one to exercise "reasonable care under the circumstances." The "circumstances" asserted by the plaintiffs are: (1) the vessel's composition, i.e., fiberglass; (2) her age, 18 years; (3) the amount of fuel on board; and (4) certain physical manifestations of hydrolysis in her hull. The "reasonable care [required] under the circumstances" asserted by the plaintiffs are: (1) removal of fuel from the vessel's tanks; and (2) placement of bilge blocks to support the vessel's weight.[7]

The Court, however, has found that neither the circumstances asserted by the plaintiffs, nor any other circumstances, imposed on Master Marine any duty to take additional or special precautions in dry docking the vessel and that Master Marine's conduct constituted reasonable care under the circumstances.

At closing argument, counsel for Certain Underwriters cited the case of *Norwich & New York Transportation Co. v. New York Balance Dock Co.*, 22 F. 672 (E.D.N.Y. 1884). In *Norwich*, the defendant dry dock was engaged to lift a vessel to bolt down her engine keelsons. Much of the vessel's engine was out of position, her walking-beam was out, and the vessel was "dismantled." *Id.* at 674. In short, the dry dock knew the fragile condition of the

vessel and had been engaged for the precise purpose of addressing some of these concerns. The *Norwich* Court unsurprisingly held that, "under such circumstances," the dry dock's professed ignorance of the vessel's condition was not a defense but "was itself negligence." *Id.* at 674–75.

Had Master Marine been engaged to repair debonded internal support members, or at least seen or been notified that over 4% of the length of such members had debonded and the rest weakened, the principle expressed in *Norwich* might well apply. Master Marine, however, was not engaged to repair debonded members or perform any other sort of structural repair, nor was it advised of the internal support members' past debonding and present fragility.

Apparently as an alternative theory of liability, the plaintiffs suggest that Master Marine voluntarily assumed a duty to remove the fuel from the vessel's tanks by agreeing to a request that this be accomplished. The Court, however, has found that no such request was made and no such agreement reached.

■ Similarly, the plaintiffs suggest that Master Marine voluntarily assumed a duty to support the vessel's hull by placing two bilge blocks on each side of the vessel. The Court, however, has found that the bilge blocks were not used by the defendant to support the hull but rather to assist in keeping the vessel from tipping to port or starboard and that the number and placement of bilge blocks was adequate and proper for their intended purpose.

The plaintiffs in closing argument ignored their expert, Albert Horsmon, and instead suggested the Court erred in not allowing several of their witnesses to testify as experts even though the witnesses had never been identified by the plaintiffs

---

7. At closing argument, counsel for Certain Underwriters disavowed any claim that the defendant's use of keel blocks was improper or a cause of the vessel's damage. The Court

has previously found that the number and placement of keel blocks by Master Marine was adequate and proper for their intended purpose.

as experts. The plaintiffs' novel argument is that, by asking questions of the witnesses at deposition, Master Marine forfeited any challenge to the admissibility of the witnesses' responses under the doctrine of invited error.

■ "The doctrine of 'invited error' is implicated when a party induces or invites the district court into making an error." *United States v. Stone,* 139 F.3d 822, 838 (11th Cir.1998). It occasionally has been applied when counsel elicits objectionable testimony at trial. *United States v. Parikh,* 858 F.2d 688, 694 (11th Cir.1988). By its terms, however, the invited error doctrine is limited to situations where a party "induces or invites *the district court* into making an error." *Stone,* 139 F.3d at 838 (emphasis added). "For example, a defendant can invite error by *introducing* otherwise inadmissible evidence *at trial.*" *Id.* (emphasis added). The "rationale" of the rule is that a party "should not benefit from introducing error *at trial.*" *Id.* (emphasis added). The Tenth Circuit has expressly ruled that the invited error doctrine does not apply when the questioning that elicited the objectionable testimony occurred at deposition and not at trial. *Reeg v. Shaughnessy,* 570 F.2d 309, 316–17 (10th Cir.1978).

The plaintiffs have offered no persuasive justification for extending the invited error doctrine to deposition testimony. To do so would cripple parties' trial preparation, as counsel could not safely examine opposing witnesses to learn their factual knowledge, opinions and bases therefor and to preclude them from subsequently voicing different or additional facts or opinions—a primary purpose of the discovery process. The plaintiffs admit that all but two of the depositions at issue were discovery depositions. (Doc. 96 at 3) While the plaintiffs note that the remaining two deponents live beyond the subpoena power of the Court, that fact does not establish that all parties knew the witnesses would not voluntarily attend trial and that their depositions would in fact (as opposed to in probability) be offered at trial.

The result would be no different even could the plaintiffs establish that the parties knew the depositions would be offered at trial. As noted, the invited error doctrine requires that a party induce *the Court* into making an error *at trial.* Master Marine did not, by asking questions in an out-of-court deposition, induce the Court to commit error.

■ The owner of a purely private pleasure vessel may not recover damages for "loss of use" to compensate for the deprivation of the owner's personal enjoyment of the vessel. Upon proper proof, however, the owner may recover damages for loss of use—sometimes (and more precisely) referred to as "loss of hire" or "loss of charter"—to compensate for monetary profits that would have flowed from chartering the vessel. *The Conqueror,* 166 U.S. 110, 125, 17 S.Ct. 510, 41 L.Ed. 937 (1897); *Central State Transit & Leasing Corp. v. Jones Boat Yard, Inc.,* 206 F.3d 1373, 1376 (11th Cir.2000). "It is not the mere fact that a vessel has been detained that entitles the owner to demurrage. There must be a pecuniary loss ... and not a mere inconvenience arising from an inability to use the vessel for the purposes of pleasure.... In other words, there must be a loss of profits in its commercial sense." *The Conqueror,* 166 U.S. at 133, 17 S.Ct. 510.

The burden is on the vessel owner "to prove, with reasonable certainty, that profits had actually been, or may reasonably be supposed to have been, lost." *Central State Transit & Leasing v. Jones Boat Yard,* 206 F.3d at 1376. The owner must prove, not only the opportunity to charter the vessel, but also " 'that he would have availed himself of' " the opportunity. *Skou v. United States,* 478 F.2d 343, 346 (5th Cir.1973) (quoting *The North Star,* 151 F. 168, 175 (2d Cir.1907)). Even had Master Marine been negligent, and even had such negligence proximately caused or contrib-

uted to the vessel's damage, Frichelle could recover no damages in this action because the Court has found that Frichelle would not have availed itself of the opportunity to charter the vessel.[8]

Master Marine is entitled to recover on its counterclaim the principal sum of $25,995.99 from Frichelle. Master Marine is not entitled to recover interest or attorney's fees because it failed to introduce Invoice Nos. 1803, 1816 and 1817, the only invoices that were not promptly paid by Frichelle, and therefore failed to establish its entitlement to such interest and attorney's fees.

### CONCLUSION

The plaintiffs have failed to establish the liability of Master Marine for damage to the vessel. In addition, Frichelle has failed to establish any damages for loss of charter resulting from the casualty. Accordingly, Master Marine is entitled to judgment on each of the plaintiffs' claims against it.

Master Marine has established the liability of Frichelle for damages in the amount of $25,995.99 and is entitled to judgment against Frichelle in this amount.

It is so ORDERED. Judgment shall be entered accordingly by separate order.

---

8. Certain Underwriters' claim for damages appears exaggerated but, because Master Marine is not at fault to begin with, it is unnecessary to determine the precise degree of the exaggeration.