The VALLEY LINE COMPANY, Plaintiff,

v.

MUSGROVE TOWING SERVICE, INC., Defendant.

Civ. A. No. H–85–241.

United States District Court, S.D. Texas, Houston Division.

Feb. 13, 1987.

J. Douglas Sutter, Ross, Griggs & Harrison, Houston, Tex., for plaintiff.

Stephen E. Ulrich, Ulrich and Ulrich, Houston, Tex., for defendant.

## FINDINGS OF FACT

## CONCLUSIONS OF LAW

McDONALD, District Judge.

This was an action filed by Plaintiff, the Valley Line Company, for money damages for losses Plaintiff sustained as a result of the alleged negligence of Defendant, Musgrove Towing Service, Inc. The damages were said to have occurred during Hurricane Alicia on or about August 18, 1983, when several of Plaintiff's barges were severely damaged while in the possession of Defendant's fleeting facility.

### Findings of Fact

1. Plaintiff The Valley Line Company was, at all times material hereto, a corporation organized and existing under the laws of some state other than the State of Texas.

2. Defendant Musgrove Towing Service, Inc. is a corporation organized and existing under the laws of the State of Texas.

3. In August 1983, the Plaintiff owned and operated a fleet of barges. Three of the barges were the VLX–7677, VLX–7552 and VBL–8130.

4. Musgrove Towing Service is in the business of providing towage and other services to barge owners and other members of the marine industry. As part of the services provided, the Defendant operates a fleeting service at Channelview, Texas. "Fleeting services," in this context, involves an agreement by Musgrove to moor the barges for a monthly charge.

5. On August 17, 1983 the three barges described above were moored in the Musgrove barge fleet at Channelview, Texas.

6. On August 18, 1983 Hurricane Alicia passed through the Houston, Texas metropolitan area. Personnel at Musgrove, and the marine industry in general, were aware that hurricane conditions were possible for one or two days prior to August 18, 1983.

7. Musgrove personnel, including K.W. "Slim" Musgrove, George "Red" Arnold, Stanley Arnold and Royce White, began preparing for the hurricane in the afternoon of August 17, 1983. Most preparations for the hurricane were completed prior to 6:00 o'clock p.m. that day.

8. On August 17, 1983, over one dozen barges were tied up at the Musgrove facility. In anticipation of the pending hurricane, other barge owners had removed their barges from the fleet.

9. In the afternoon and early evening of August 17, 1983 the four Musgrove employees identified above prepared for the hurricane. Extra lines were deployed and steel cables were set in place to moor the barges to the shore. Every available appliance for use in mooring was put to use. The barges were moored with fiber lines which were in serviceable condition.

10. The personnel working at Musgrove all had substantial experience in the handling of barges. Several had moored barges for previous hurricanes. Musgrove has prepared its facility for use in fleeting of barges by sinking several older "derelict" barges along the banks of the Old and Lost River. The barges which are fleeted are moored "head-in" or "stern-in" to the derelict barges. The fleeted barges are then tied together. This generally presents a very favorable position because

the water at that location is still and generally unaffected by wave wash from other vessels and tides.

11. The four Musgrove employees remained on duty during the hurricane. K.W. "Slim" Musgrove manned a tugboat named the Stud. There was an adequate number of trained and experienced personnel to tend the barges.

12. Weather conditions generally deteriorated during the night of August 17/18, 1983. At approximately 2:00 o'clock a.m., the winds rose to hurricane force and continued at hurricane force for several hours. Maximum sustained winds were 113 miles per hour to 157 miles per hour. In the early morning hours of August 18, 1983, the Musgrove facility experienced a tremendous surge of water blown in from the Galveston Bay. The water rose approximately 15 feet in about approximately one hour. During that surge, the Plaintiff's barges apparently came afloat and drifted over the derelict barge where they were moored. Although it is apparent that some of the mooring lines securing the barge parted, most of them did not. Had all of the lines all parted, the barge would have continued to float and would have come to rest far away from the facility. Instead, the barges simply floated over the derelict barge and remained in place.

13. Just as quickly as the waters rose, the surge receded. After the water level receded, the Plaintiff's barges were stranded on the derelict barge. Neither the rate of rise nor the rate of decrease in the water level could have been reasonably anticipated by those at the Musgrove facility. Even if they had anticipated the surge, nothing else could have been done to prevent the barge from coming afloat.

14. At trial, the Plaintiff proposed that the Defendant somehow was negligent because the Plaintiff's barges were moored "stern-in" or "head-in" instead of "side-to" the derelict barges. The testimony of Mr. Slim Musgrove and Mr. David Lowe confirmed that the method employed by the Defendant is as good as, and probably better than, the "side-to" mooring method now championed by the Plaintiff. Use of the "stern-in"/"head-in" mooring method was not negligence under the circumstances.

15. The Defendant's decision to employ a derelict barge system of mooring does not constitute negligence. This procedure was well known and generally recognized in the area as an acceptable method of mooring barges.

16. At trial, the Plaintiff urged that the Defendant was negligent because the derelict barges had some debris on them, and that this debris punctured Plaintiff's barges when they came to rest on top of the derelict barges. Because the derelict barges were never intended to have other barges stacked on top of them, any debris found on the surface of the derelict barges would not constitute negligence.

### Conclusions of Law

1. This Court has personal jurisdiction of the parties and subject matter jurisdiction over this controversy.

■ 2. The fleeting arrangement between the Plaintiff and Defendant represents a bailment for the benefit of both parties. The bailed articles, the barges, were placed into the custody of the bailee/defendant prior to Hurricane Alicia's arrival. Failure to return the barges in same good order and condition as it was delivered gives rise to a presumption of negligence on the part of the bailee/defendant. *Hicks v. Tolchester Marina,* 1984 A.M.C. 2027, 2029 (D.M.1983).

■ 3. The presumption of negligence arising out of the bailee/bailor relationship, however, is a rebuttable presumption. To rebut a presumption of negligence, the bailee must show that the damage was not caused by any act or omission on its part and that it exercised due care in all that it did with respect to the bailed article. *Hicks,* 1984 A.M.C. 2029–30.

■ 4. The Defendant has urged the defense of act of God to rebut the presumption of negligence in the bailee/bailor relationship. To prevail, the Defendant

must show that the storm constituted an act of God and that the Defendant was guilty of no negligence which contributed to the damage in issue. *Hicks*, 1984 A.M.C. 2030.

5. An act of God is a catastrophy which triumphs over the safeguards by which skillful and vigilant seamen normally bring ship and cargo to safety. *Dion's Yacht Yard v. Hydro Dredge Corp.*, 1982 A.M.C. 1657, 1682 (D.Mass.1981).

6. Although the Defendant had notice that Hurricane Alicia would pass through the Houston, Texas area, it was unaware that the tidal surge which accompanied the hurricane would be so severe and so rapid. This was, indeed, a catastrophy against which no reasonable fleet operator could prevail. On that point, the Court notes that the area around the Musgrove fleet experienced winds in excess of 113 miles per hour and there is some evidence that tornadoes were present in the area. Although no person could specifically identify a tornado because the hurricane arrived under the cover of darkness, it certainly appears that a tornado may have passed through the fleeting facility. A tornado, of course, is an unexpected peril against which the Defendants could not have prepared.

7. In addition, the Court also notes that several barge fleeting concerns operate in the general facility of the Musgrove facility. These include the Western Towing Company, Cougar Towing, Southwestern Barge Fleet, InterBay Towing, and a few others. All of these experienced some breakup of barges in their fleet. In fact, Western Towing Company experienced a complete breakup of its fleet of over 100 barges.

8. The Court finds and concludes that the Defendant has committed no act or omission which constitutes negligence.

9. The Defendant is not liable to the Plaintiff.

## FINAL JUDGMENT

Pursuant to the Court's Findings of Fact and Conclusions of Law entered this day, it is hereby ORDERED, ADJUDGED, and DECREED that judgment should be awarded to Defendant and that this action be and hereby is DISMISSED with prejudice. Costs shall be taxed against the Plaintiff.

THIS IS A FINAL JUDGMENT.