# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 30, 2014

Lyle W. Cayce
Clerk

No. 10-20767

NATIONAL LIABILITY & FIRE INSURANCE COMPANY,,

Plaintiff–Appellant,

v.

R & R MARINE, INC.; R & R MARINE OFFSHORE, INC.; R & R MARINE MAINTENANCE, INC.; R & R SHIPBUILDERS, INC.,

Defendants–Appellants,

v.

HORNBECK OFFSHORE SERVICES, L.L.C.,

Defendant–Appellee.

Appeals from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, OWEN, and GRAVES, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

This case arises out of the sinking of a vessel owned by Hornbeck Offshore Service (Hornbeck) while at R&R Marine's (R&R) shipyard for repairs. R&R's liability insurer, National Liability & Fire Insurance Company (National), initiated this suit to disclaim liability under its policy. Hornbeck counterclaimed that the policy obligated National to cover all sums for which R&R became

No. 10-20767

obligated to pay and cross-claimed against R&R to assert that R&R's negligence caused the sinking of its vessel. The district court found that R&R was negligent and that National was liable for the ensuing damage. National and R&R appeal. We affirm in part, reverse in part, and remand for entry of judgment consistent with this opinion.

**I**

Hornbeck engaged R&R to repair and refit two vessels: the Erie Service, and the Superior Service. Only the repair of the Erie Service is at issue here. R&R was to perform the work at its shipyards on Lake Sabine in Port Arthur, Texas, subject to the terms of the Shipyard Repair and Drydock Agreement (Agreement). Under this Agreement, "[t]he Vessel(s) [were] deemed accepted into the 'Custody' of the Shipyard when the Vessel(s), with prior notice to the Shipyard, arrive[d] afloat ready to be moored." The Erie Service was afloat upon delivery and R&R was aware of and anticipated its arrival. It is undisputed that the Erie Service was in R&R's custody as of June 2007.

Prior to arrival, much of the vessel's deck plating and bulwarks had been removed in order for R&R to replace deteriorated steel. From June through September, only R&R performed the overhaul work on the Erie Service. Under the Agreement, however, Hornbeck retained access to its vessel so that it could inspect the work and ensure compliance with specifications. To that end, Hornbeck maintained two on-site project managers at R&R's facilities. If these managers observed an issue with or objected to an aspect of R&R's performance, they had the authority to give, and R&R was obligated to follow, orders. Hornbeck's on-site managers also monitored the subcontractors on the Erie Service who were performing work unrelated to R&R's responsibilities.

On September 12, it began to rain and R&R sent its workers home at approximately 9:00 a.m. R&R notified Hornbeck by email of this decision, requesting an extension due to weather delay. At 10:00 a.m., the National

No. 10-20767

Hurricane Center (Center) advised the public that Tropical Depression No. 9 had formed and issued a tropical storm warning for an area that included Port Arthur. This meant that sustained winds within the range of 39 to 73 miles per hour could be expected within 24 hours or less. R&R promptly forwarded this warning to Hornbeck to substantiate its request for an extension. In response, one of Hornbeck's project managers asked what actions R&R would be taking for "water entry issues." R&R responded at 10:49 a.m. that the dock was "monitored around the clock everyday" and that it kept "pumps on hand to pump out rain water when required."

By 1:00 p.m., Tropical Depression No. 9 had intensified into Tropical Storm Humberto. Though the Center changed the warning area's boundaries throughout the day, Port Arthur always remained, and in fact became more centered within, the region of concern. Nevertheless, all R&R personnel left the shipyard at 5:00 p.m. without taking any precautions. A hurricane warning did not issue until 12:15 a.m. on September 13. When R&R employees arrived that morning, the Erie Service was listing severely and sinking. Sometime before 7:00 a.m., the Erie Service sank. The parties have stipulated that the Erie Service sank because rainfall and waves from Lake Sabine caused water to enter through the vessel's openings.

Hornbeck received several salvage bids for its vessel, including a "no cure, no pay" option, pursuant to which Hornbeck would have paid $298,000 for a successful salvage. Hornbeck, however, accepted a time-and-materials bid, which cost $245,000 but was subject to unlimited increase if the job proved more difficult than anticipated. The salvage company initially dispatched two derrick barges, but it was necessary to use a third. The salvage work ultimately cost $627,324.64. Hornbeck and R&R demanded that National, R&R's insurer, pay these salvage costs directly.

No. 10-20767

Shortly thereafter, National commenced this litigation against both R&R and Hornbeck to seek a declaratory judgment that it was not required to pay for the salvage costs under a commercial marine liability policy that National had issued to R&R. Hornbeck filed a counterclaim against National asserting, among other things, that "the Policy provide[d] coverage for all sums, including salvage, for which R&R bec[ame] obligated to pay for damage to the ERIE SERVICE while in the care, custody, or control of R&R." Hornbeck also filed a cross-claim asserting that R&R's negligence proximately caused the sinking of the Erie Service.

After eight hearings and two trials, the district court issued a final judgment, which held, in relevant part, that R&R was negligent in failing to secure the Erie Service and protect her from damage by the storm, and that National was required to pay Hornbeck $1,076,843.09 for losses to the Erie Service and additionally to pay to Hornbeck 18 percent interest on this amount, plus $213,683.95 in attorney's fees.

Appeals by National and R&R followed.

## II

We first address National and R&R's assertion that the district court erred in finding that R&R's negligence caused the sinking of the Erie Service. Negligence and proximate cause are factual findings that we review for clear error.[1] "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, based on all of the evidence, is left with a definite and firm conviction that a mistake has been made."[2] But "[i]f the district court's finding is plausible in light of the record as a whole, [this court] cannot reverse

---

[1] *Bertucci Contracting Corp. v. M/V Antwerpen*, 465 F.3d 254, 258 (5th Cir. 2006) ("Because this case was decided by the district court without a jury, we review the district court's factual findings for clear error." (citing FED. R. CIV. P. 52(a)(6))).

[2] *Stolt Achievement, Ltd. v. Dredge B.E. Lindholm*, 447 F.3d 360, 363 (5th Cir. 2006).

No. 10-20767

even though, if sitting as the trier of fact, it would have weighed the evidence differently."[3]

R&R argues that it never had full custody of the Erie Service and alternatively, Hornbeck failed to meet its burden of proof. We conclude that the district court did not clearly err in finding that R&R was negligent.

**A**

Bailment law governs where, as here, a vessel is left in the shipyard's custody for repairs.[4] Bailment imposes a duty of ordinary care upon the bailee.[5] While the "burden of proof of negligence is on the bailor," by showing that the "vessel was delivered to the bailee in good condition and damaged while in his possession, the bailor makes out a prima facie case of negligence; and the duty then devolves upon the bailee to go forward with the evidence and show affirmatively that he exercised ordinary care."[6]

Here, the district court determined that Hornbeck had established a prima facie case of negligence because it found that the Erie Service was delivered to R&R afloat, R&R had full custody of the vessel, and the vessel sank while under R&R's care. Therefore, the court imposed a presumption of negligence that R&R was required to rebut. R&R, however, contends that such a presumption was erroneous because only a limited bailment was created. It argues that Hornbeck's agents' unconditional access to the Erie Service to oversee R&R's performance, authority to give orders to R&R, and the presence of other subcontractors on the Erie Service undermine the finding that R&R had full custody.

---

[3] *Bertucci*, 465 F.3d at 258.

[4] *See, e.g.*, *Buntin v. Fletchas*, 257 F.2d 512, 513 (5th Cir. 1958).

[5] *Stegemann v. Miami Beach Boat Slips, Inc.*, 213 F.2d 561, 564 (5th Cir. 1954).

[6] *Id.*

No. 10-20767

A bailment becomes limited "[w]here the delivery of the thing is not complete, as when the owner remains with the thing or has an independent agent or employee responsible for it or for certain aspects of its care."[7] A limited bailment occurs when exclusivity of control over the bailed object is compromised.[8] However, neither the presence and authority of Hornbeck's agents to ensure compliance nor the presence of other subcontractors affected R&R's exclusive control over the Erie Service, its movement within R&R's shipyard, or most importantly, its integrity during the storm. As the district court found, R&R's stipulation to full custody in the Agreement,[9] its control over the worksite, and R&R's responsibility for disaster preparation were all indicators of full custody, at least during the period leading up to and through the Erie Service's sinking.

This finding of full custody is not clearly erroneous in light of the record as a whole. The initial exchange of emails shows that both Hornbeck and R&R understood R&R to be responsible for protecting the vessel. Furthermore, R&R alone had control over when, where, and how to moor the vessel. R&R stated

---

[7] *Id.* at 565.

[8] *See Chi., St. L. & N.O.R. Co. v. Pullman S. Car Co.*, 139 U.S. 79, 94-96 (1891) (limited bailment where bailor made separate repairs in a separate shop under its exclusive control and to which the bailee had no access); *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 19 (1st Cir. 1991) (limited bailment where bailor's agent was making the same repairs alongside the bailee's employees); *Sisung v. Tiger Pass Shipyard Co.*, 303 F.2d 318, 322 (5th Cir. 1962) ("While it is our opinion that the exercise of ordinary care required appellee, as the one in possession of the vessel as bailee or during delivery to have ascertained if the vessel would be left overnight, and to move it to a place of safety in the event it was to be left overnight . . ., where the owner maintains some dominion over the vessel, as Sisung did by *selecting the place of mooring*, there is a corresponding limitation on the duty of the bailee . . . ." (emphasis added) (citing *Stegemann*, 213 F.2d 561)); *City Compress & Warehouse Co. v. U.S.*, 190 F.2d 699, 701-03 (4th Cir. 1951) (limited bailment where vessel owner was responsible for mooring his own ship).

[9] *See T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 588 (5th Cir. 1983) (defining a bailment as a "delivery of goods . . . by one person to another . . . beneficial either to the bailor or bailee or both, and *upon a contract*, express or implied . . . ." (emphasis added) (quoting BLACK'S LAW DICTIONARY 129 (5th ed. 1979))).

6

No. 10-20767

during trial that if it had had more time, it would have moved the Erie Service to another shipyard. R&R even had a plan in place for Hurricane Dean—which occurred one month before Hurricane Humberto—to move the Erie Service to another shipyard. There was also testimony establishing a shipyard's general responsibility to handle all mooring of vessels. The record shows that R&R shouldered responsibility for and was in control of protecting the Erie Service from inclement weather. It was not clearly erroneous for the district court to conclude that R&R had full custody of the Erie Service.[10]

## B

R&R argues that even if it had full custody of the vessel, it overcame the presumption of negligence and Hornbeck subsequently failed to affirmatively prove R&R's negligence. We do not reach this argument, however, because the district court's finding that R&R had not overcome the presumption of negligence was not clearly erroneous.

As discussed above, a prima facie case for negligence shifts the burden to the bailee to demonstrate that it exercised ordinary care. This court's precedent suggests two views on how a bailee satisfies this burden.[11] One view requires that a bailee "show only that the loss was caused by some act consistent with due care on his part, such as an act of God."[12] The other view is that the bailee must "show affirmative[] acts which constitute due care."[13] Though the latter

---

[10] Though R&R also argues that Hornbeck should be found comparatively negligent, this assertion is foreclosed by our affirmance of the district court's conclusion that R&R had full custody of the Erie Service.

[11] *Buntin v. Fletchas*, 257 F.2d 512, 514 (5th Cir. 1958).

[12] *Id.*

[13] *Id.*

view is more often expressed,[14] we need not address which is the more appropriate since under either, R&R's explanation fails to establish that it exercised ordinary care.

To rebut the presumption of negligence, R&R argued that the unexpected severity of Hurricane Humberto rendered its inaction reasonable. The district court found, however, that R&R could not "verify that the storm ever reached hurricane-strength at the yard." The district court found, therefore, that R&R had failed to demonstrate the unexpected severity of the weather was an act of God.[15] This finding is plausible in light of the record as a whole. The sustained winds did not reach hurricane force in Port Arthur but were within the range of tropical storm force winds. Nor did the rainfall exceed what was predicted when a tropical storm warning was first issued. The actual weather conditions experienced in Port Arthur were those that had been projected at 10:00 a.m. on September 12—the projection that R&R forwarded to Hornbeck. Nor did R&R satisfy its burden under the second view of bailment law. As R&R concedes on appeal, the district court correctly found that R&R could not point to any affirmative acts R&R took that constituted due care.

### III

R&R contends that even if it was negligent, it is not liable for the full-invoiced salvage amount because Hornbeck's choice between salvage bids was unreasonable and the salvage company's negligence caused the increased cost of salvage. We are unpersuaded.

---

[14] *Chicopee Bank v. Phila. Bank*, 75 U.S. 641, 650 (1869); *CFC Fabrication, Inc. v. Dunn Const. Co.*, 917 F.2d 1385, 1389 (5th Cir. 1990); *Sisung v. Tiger Pass Shipyard Co.*, 303 F.2d 318, 322 (5th Cir. 1962); *Valley Line Co. v. Musgrove Towing Serv., Inc.*, 654 F. Supp. 1009, 1011 (S.D. Tex. 1987).

[15] *See also Valley Line*, 654 F. Supp. at 1012 ("[Defendant] was unaware that the tidal surge which accompanied the hurricane would be so severe and so rapid . . . . On that point, the Court notes that the area around the Musgrove fleet experienced winds in excess of 113 miles per hour and there is some evidence that tornadoes were present in the area.").

**A**

"The burden of showing that the victim of tortious conduct failed to minimize his damages rests with the wrongdoer."[16]  The tortfeasor must show "(1) that the conduct [of the victim] was unreasonable, and (2) that it had the consequence of aggravating the harm."[17]  R&R argues that Hornbeck's selection of the time-and-materials bid was unreasonable because it was against common industry practice and because Hornbeck should have known that the vessel's fragile condition made the salvage operation more complex.  The district court held that Hornbeck's selection of the time-and-materials bid was reasonable.

Again, we review for clear error.  In doing so, we emphasize that "reasonableness" here does not require "infallibility or exactness of mathematical formula."[18]  We "will allow the injured party a wide latitude in determining how best to deal with the situation" because "the necessity for decision-making was thrust upon him by the defendant, and judgments made at times of crisis are subject to human error."[19]  In light of this deferential standard, the district court's finding that Hornbeck acted reasonably was not clearly erroneous.  "[T]he fact that [an injured party's] efforts turn[ed] out to be unsuccessful and actually increase[d] the loss does not preclude recovery for all expenses incurred in the process."[20]  R&R presents no relevant evidence of common industry practice; nor does the condition of the vessel remove Hornbeck's bid selection  from the "range

---

[16] *Tenn. Valley Sand & Gravel v. M/V Delta*, 598 F.2d 930, 933 (5th Cir. 1979).

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

No. 10-20767

of reason."[21]  Accordingly, the district court did not err by finding R&R liable for the full-invoiced amount.

**B**

Alternatively, R&R argues that it is not liable for the additional salvage cost because it was caused by the salvage company's negligence.  Although there was testimony at the damages hearing that the salvage company should have known better than to first attempt the operation with the two barges, testimony as to the salvage company's reasonableness was also presented.  As discussed above, when reviewing for clear error, this court cannot reverse even if, sitting as a trier of fact, we would have weighed the evidence differently.[22]  In any event, even if the salvage company had been negligent, R&R would remain fully liable because this negligence was a foreseeable consequence of R&R's own negligence.[23]

**IV**

The district court held that National was required by the terms of its policy to pay the amount of damages that R&R owed to Hornbeck as a consequence of R&R's negligence in causing the sinking of the Erie Service. National concedes that if R&R was negligent, it must pay up to its policy limits to Hornbeck for R&R's negligence once a final judgment is entered against R&R. However, National contends no final judgment was entered against R&R as a

---

[21] *See Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288, 290 (2d Cir. 1961); *see also Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 863 & n.30 (5th Cir. Unit B 1981).

[22] *See Reich v. Lancaster*, 55 F.3d 1034, 1045 (5th Cir. 1995) ("Rule 52(a) also requires that we give due regard to the opportunity of the trial court to judge the credibility of the witnesses.  The trial judge's unique perspective to evaluate the witnesses and to consider the entire context of the evidence must be respected." (internal quotation marks omitted)).

[23] *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 832-35 (1996) (holding Sofec was not liable for its negligence in permitting Exxon's tanker to become unmoored because the captain's subsequent navigational decisions were so "extraordinarily" negligent, they were not foreseeeable and were therefore the superseding and sole proximate cause of the damage).

No. 10-20767

necessary predicate to National's liability. National contends that Hornbeck lacked standing as a third-party claimant to bring its counterclaim. We review a district court's standing decision de novo.[24] Texas law governs the parties' substantive rights.

As an initial argument, National asserts that Hornbeck did not adequately raise a third-party claim in the district court. We disagree. The record reflects that National had fair notice under the liberal pleading standard,[25] and National's pre-trial conduct and communications demonstrate that it was fairly notified that Hornbeck intended to bring a third-party claim.[26]

National is correct, however, that as a general proposition, Texas law requires that when an insured damages the property of a third party, the insurer is not obligated to pay the damages on behalf of its insured until there is a final judgment rendered against the insured or a settlement agreement. Because "Texas is not a direct action state," "a tort claimant has no direct cause of action against the tortfeasor's liability insurer until the insured-tortfeasor is adjudged liable to the claimant."[27] Texas courts have construed this to be a rule of standing[28] and thus consider whether a final liability judgment existed at the

---

[24] *Delta Commercial Fisheries Ass'n v. Gulf of Mex. Fishery Mgmt. Council*, 364 F.3d 269, 272 (5th Cir. 2004).

[25] FED. R. CIV. P. 8(a); *Wampler v. S.W. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010).

[26] *See Sundstrand Corp. v. Standard Kollsman Indus., Inc.*, 488 F.2d 807, 811 (7th Cir. 1973) (citing *State Farm Mut. Auto. Ins. Co. v. Scott*, 198 F.2d 152, 153 (5th Cir. 1952)).

[27] *Ohio Cas. Ins. Co. v. Time Warner Entm't Co.*, 244 S.W.3d 885, 888-89 (Tex. App.—Dallas 2008, pet. denied); *see also Great Am. Ins. Co. v. Murray*, 437 S.W.2d 264, 265 (Tex. 1969); *Seaton v. Pickens*, 87 S.W.2d 709, 710 (Tex. 1935); *Sun Oil Co. v. Emp'rs Cas. Co.*, 550 S.W.2d 348, 349 (Tex. App.—Dallas 1977, no writ); *Morris v. Allstate Ins. Co.*, 523 S.W.2d 299, 301 (Tex. App.—Texarkana 1975, no writ).

[28] *See, e.g.*, *Ohio Cas.*, 244 S.W.3d at 888.

11

time a claim was filed.[29] National is correct that under Texas law, Hornbeck had no "standing" at the time it filed its counterclaim because there was no final judgment establishing R&R's liability. Hornbeck counters that it was "forced" to assert its counterclaim against National when National sued Hornbeck for a declaratory judgment because Hornbeck's counterclaim was "compulsory" within the scope of the Federal Rules.

Under the *Erie* doctrine,[30] "federal courts sitting in diversity apply state substantive law and federal procedural law."[31] Because "[c]lassification of a law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor," *Erie* and its progeny provide a multi-step inquiry.[32] However, "[w]hen a party has alleged a direct conflict between the Federal Rules and state law, [] an additional step precedes the *Erie* analysis."[33] "The initial step is to determine whether, when fairly construed, the scope of [the Rule] is sufficiently broad to cause a direct collision with the state law or, implicitly, to control the issue before the court, thereby leaving no room for the operation of that law."[34] "In determining whether the Rule covers a particular issue, we look to the plain meaning of the Rule's language."[35] We also look to judicial interpretations of

---

[29] *Owens v. Allstate Ins. Co.*, 996 S.W.2d 207, 208-09 (Tex. App.—Dallas 1998, pet. denied) (holding that insurance company lacked standing to bring interpleader action "because [the insured-tortfeasor] was not legally responsible to pay for any of the defendants at the time of the interpleader petition").

[30] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[31] *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

[32] *Id.*

[33] *All Plaintiffs v. All Defendants*, 645 F.3d 329, 333 (5th Cir. 2011) (citing *Hanna v. Plumer*, 380 U.S. 460, 469-70 (1965)).

[34] *Id.* (internal quotation marks omitted).

[35] *Id.*

that language.[36]  If a direct collision exists, we must apply the Federal Rule as long as it does not violate either the Constitution or the Rules Enabling Act.[37]

Having already determined that state law would otherwise bar the timing of Hornbeck's counterclaim, we next consider whether the filing was compulsory under federal law.  The plain language of Rule 13 defines a counterclaim as "compulsory" if it (1) "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" and (2) "does not require adding another party over whom the court cannot acquire jurisdiction."[38]  We also employ the logical relation test to "further define when a claim and counterclaim arise from the same transaction."[39]  "The logical relation test is a loose standard which permits a broad realistic interpretation in the interest of avoiding a multiplicity of suits."[40]  A logical relationship exists "when the counterclaim arises from the same 'aggregate of operative facts' in that the same operative facts serve[] as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant."[41]

Hornbeck's counterclaim was compulsory within the scope of Rule 13(a).  First, the counterclaim arises out of the same occurrence—damage to the Erie Service—that is the subject matter of National's declaratory action.  The counterclaim does not require adding another party since National brought its

---

[36] *See id.* at 333-34 (discussing Supreme Court precedent in determining the scope of Rule 23(e) under the Federal Rules of Civil Procedure).

[37] *Id.*; *Douglas v. NCNB Tex. Nat'l Bank*, 979 F.2d 1128, 1130 (5th Cir. 1992).

[38] FED. R. CIV. P. 13(a)(1)(A), (B).

[39] *Plant v. Blazer Fin. Servs., Inc. of Ga.*, 598 F.2d 1357, 1360 (5th Cir. 1979).

[40] *Id.* at 1361 (internal quotation marks omitted).

[41] *Id.* (quoting *Revere Copper & Brass, Inc. v. Aetna Cas. & Sur. Co.*, 426 F.2d 709, 715 (5th Cir. 1970)).

initial action against both R&R and Hornbeck. There is a logical relationship between National's disclaimer of liability and Hornbeck's counterclaim that National *is* liable since the same facts underlie both causes. A "direct collision" between state and federal law exists because Hornbeck could not have complied with both state and federal law as to when to assert its counterclaim.

We must, therefore, apply Rule 13(a) so long as it does not violate either the Constitution or the Rules Enabling Act. No constitutional rights are implicated here. Neither does the application of 13(a) violate the Rules Enabling Act because the timing of Hornbeck's counterclaim does not "abridge, enlarge or modify any substantive right" under Texas law.[42] Furthermore, applying 13 (a) vindicates "[o]ne of the shaping purposes of the Federal Rules," which is "to bring about uniformity in the federal courts . . . . This is especially true of matters which relate to the administration of legal proceedings, an area in which federal courts have traditionally exerted strong inherent power, completely aside from the powers Congress expressly conferred in the Rules."[43] Rule 13(a) relates to the "administration of legal proceedings" because it was "designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters."[44] Here, it permitted the district court to efficiently address all disputes arising from this litigation. Rule 13(a) merely "alters the *mode* of enforcing state-created rights," and governs the timing of Hornbeck's counterclaim; to hold otherwise "would be to disembowel either the

---

[42] 28 U.S.C. § 2072(b); *cf. Douglas*, 979 F.2d at 1130 (denying application of Rule 13(a) despite likelihood that state-law claims were compulsory because forcing defendants to counterclaim would have deprived them of non-judicial remedies under Texas law).

[43] *Hanna v. Plumer*, 380 U.S. 460, 472-73 (1965) (quoting *Lumbermen's Mut. Cas. Co. v. Wright*, 322 F.2d 759, 764 (5th Cir. 1963)).

[44] *S. Const. Co. v. Pickard*, 371 U.S. 57, 60 (1962) (per curiam).

No. 10-20767

Constitution's grant of power over federal procedure or Congress' attempt to exercise that power in the Enabling Act."[45]

In sum, Rule 13(a) is valid and controls in this case. Consequently, Hornbeck had standing to bring its counterclaim. and the district court properly ruled on that claim after deciding R&R's liability.[46]

## V

National challenges the damages award, the award of attorney's fees to Hornbeck, and the assessment of 18% interest on the damage award under the Texas Insurance Code. We conclude that the district court erred in the amount of damages that it awarded and in applying an 18% interest rate.

The district court found that the loss to Hornbeck resulting from R&R's negligence in the sinking of the Erie Service was $1,076,843.09. The judgment against National in favor of Hornbeck included this entire amount. However, it is undisputed that National's policy limit was $1,000,000. The district court erred in awarding Hornbeck in excess of National's policy limits. The award of $1,076,843.09 in damages is accordingly reduced to $1,000,000.

National argues that this amount should be further reduced because it expended in excess of $150,000 in defending R&R against Hornbeck's claim of negligence. The policy provides that defense costs are included within the $1,000,000 policy limit, and therefore, defense costs would "erode" this coverage. However, National did not plead for or prove its defense costs in the district court. It argues in its briefing in our court that it never had the opportunity to do so. This argument is without merit. There was ample opportunity for National to raise and to have the trial court resolve this issue during the lengthy course of the litigation that National itself initiated. National could not rely on

---

[45] *Hanna*, 380 U.S. at 473-74 (emphasis added).

[46] *See* FED. R. CIV. P. 13(i), 42(b).

its argument that Hornbeck had no standing to seek to be paid from the proceeds of R&R's policy until there was a final judgment against R&R as an excuse for failing to raise the issue of defense costs and to prove those costs in the district court.

The district court awarded attorney's fees from National to Hornbeck in the amount of $213,683.95. Whether National was entitled to recover attorney's fees is determined under state law,[47] unless attorney's fees were imposed as a sanction. Though the district court's order did not express the basis for the grant of attorney's fees, the court's discussion during the fees hearing suggests at least three bases. First, the court may have relied on section 542.060 of the Texas Insurance Code, which provides that an insurer is liable to a beneficiary for "reasonable attorney's fees" should the insurer fail to promptly pay a claim.[48] The court explicitly tied National's obligation to pay attorney's fees to the Texas Insurance Code but also stated that Hornbeck was due these fees "because of National's irrationally prolonging the litigation." Or the court may have granted attorney's fees pursuant to section 38.001(8) of the Texas Civil Remedies and Practice Code, which provides for reasonable attorney's fees if the claim is under an oral or written contract.

The attorney's fees cannot be upheld under section 542.060 of the Texas Insurance Code. Section 542.053 of that Code expressly provides that chapter 542 "does not apply to . . . marine insurance," which is defined as covering "a marine builder or repairer risk."[49] Nor can the award be upheld as sanctions.

---

[47] *See INA of Tex. v. Richard*, 800 F.2d 1379, 1381 (5th Cir. 1986) (per curiam) (noting that the award of attorney's fees in disputes involving marine insurance policies is governed by state law).

[48] TEX. INS. CODE ANN. § 542.060.

[49] TEX. INS. CODE ANN. §§ 542.053, 1807.001.

No. 10-20767

There were no findings or proceedings that would support the imposition of sanctions.

It appears, however, that attorney's fees are recoverable under section 38.001 of the Texas Civil Practice and Remedies Code, even though section 38.006(2) of that Code provides that "[t]his chapter does not apply to a contract issued by an insurer that is subject to the provisions of . . . Chapter 541, Insurance Code."[50]  National appears to be subject to the provisions of Chapter 541.  The Supreme Court of Texas has held that notwithstanding what might seem to be the clear language of section 38.006, an "insurer is liable for reasonable attorney's fees incurred in pursuing the breach-of-contract action under section 38.001 unless the insurer is liable for attorney's fees under another statutory scheme."[51]  The remaining question is whether Hornbeck may sue for breach of the insurance contract even though it is not a party to National's and R&R's contract.  The parties have not cited, and we have been unable to find, a decision from a Texas court that squarely addresses the issue.  The Supreme Court of Texas has held that "only a third party beneficiary who could enforce a contract to which she is not a party would also be able to sue for attorney's fees under the contract provision of [what is now section 38.001]," and that "the key to determining [the third party's] eligibility for an attorney's fee award . . . requires an analysis of their possible standing as third party beneficiaries to the . . . automobile liability insurance contract."[52]  In that case, Childress was injured in an automobile collision with Booth and after obtaining a judgment against Booth, sued Booth's insurer to recover the damages he had

---

[50] TEX. CIV. PRAC. & REM. CODE ANN. § 38.006(2).

[51] *Grapevine Excavation, Inc. v. Md. Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000).

[52] *Dairyland Cnty. Mut. Ins. Co. of Tex. v. Childress*, 650 S.W.2d 770, 775 (Tex. 1983).

been awarded from Booth.[53]  The Supreme Court reasoned that "[t]here is no claim that either Dairyland [the insurer] or Booth [the insured] contemplated that Childress would become [a] claimant[] of the insurance policy in question. This fact might be determinative of the question but for the statutory scheme that made it incumbent upon Booth, as a driver, to have liability insurance in the first place."[54]  Similarly, in the present case, there is no claim that National and R&R contemplated that Hornbeck specifically, as distinguished from R&R's clients generally, would become a claimant under the insurance policy.  There is no statute in Texas requiring a ship repairer to carry liability insurance. Accordingly, the Supreme Court's decision in *Dairyland* does not resolve the question.

A Texas court of appeals said in *dicta* that "[a] party who is injured by an insured is considered a third-party beneficiary of a liability insurance policy,"[55] but neither of the cases the decision cited for this proposition[56] supported the statement, and the statement was entirely unnecessary to the court of appeals' holding because the third party had not obtained a judgment against or settled with the insured at the time she sued the insurer and therefore could not proceed against the insurer at that time.[57]

However, a court of appeals permitted Ischy, the widow of a worker killed on the job in an airplane crash, to recover attorney's fees from her deceased

___

[53] *Id.* at 772.

[54] *Id.* at 775.

[55] *Rust v. Tex. Farmers Ins. Co.*, 341 S.W.3d 541, 547 (Tex. App.—El Paso 2011, pet. denied).

[56] *State Farm Cnty. Mut. Ins. Co. of Tex. v. Ollis*, 768 S.W.2d 722, 723 (Tex. 1989); *Great Am. Ins. Co. v. Murray*, 437 S.W.2d 264, 265 (Tex. 1969).

[57] *Rust*, 341 S.W.3d at 551-52.

husband's employer's workers' compensation carrier.[58]    The workers' compensation carrier had paid benefits to Ischy and was obligated to pay future compensation benefits to her at the time that she sued and then settled with the operator of the aircraft in which her husband perished.[59]    The workers' compensation carrier was entitled to recover from the settlement proceeds the amounts that it had paid to Ischy, and as a result of the settlement, the carrier was relieved from its obligation to pay future benefits.[60]  Ischy sued the carrier to obtain attorney's fees under Tex. Rev. Civ. Stat. Ann. art. 8307, § 6a for the services rendered by her attorney that benefitted the carrier in her suit against the aircraft operator.[61]  Ischy prevailed on that claim under art. 8307, § 6a, then sought to obtain her attorney's fees incurred in bringing the suit against the workers' compensation carrier.[62]  The court of appeals held that "[a]lthough Ischy is not suing to enforce the contract, we have concluded that this suit is founded upon a contract for purposes of § 38.001 attorney's fees.  It is undisputed that Ischy was a potential beneficiary of the contract."[63]

Although Texas law is not clear, we make an *Erie* guess[64] and conclude that the Texas courts would construe section 38.001 as allowing Hornbeck to recover attorney's fees from National.  Accordingly, the district court did not err

---

[58] *Ischy v. Twin City Fire Ins. Co.*, 718 S.W.2d 885, 888 (Tex. App.— Austin 1986, writ ref'd n.r.e.).

[59] *Id*. at 885-86.

[60] *Id*. at 886.

[61] *Id*. at 887-88 (citing TEX. REV. CIV. STAT. ANN. art. 8307, § 6a (West Supp. 1986)).

[62] *Id*. at 888 ("The third point of error requests attorney's fees for the prosecution of this lawsuit.").

[63] *Id*.

[64] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

in awarding attorney's fees.  National does not challenge the amount of those fees.

However, the district court did err in the rate of interest that it determined was to be applied.  The district court's judgment awarded Hornbeck interest from National on $1,076,843.09 at the rate of 18% per year, citing section 542.060 of the Texas Insurance Code.  First, the amount subject to interest must be reduced to $1,000,000, for the reasons considered above.  We also conclude that the 18% rate of interest was contrary to Texas law.  "We review de novo the district court's determination of state law."[65]  Section 542.060 of the Texas Insurance Code "does not apply to . . . marine insurance," which is defined as covering "a marine builder or repairer risk."[66]  Because National's policy with R&R falls directly within this exception, the district court erred in awarding interest under the Texas Insurance Code.  The pre-judgement rate of interest on the $1,000,000 damage award is modified to 6.0%.

*     *     *

For the foregoing reasons, we AFFIRM the district court's judgment in part, REVERSE that judgment in part, and remand for the entry of judgment and the appropriate assessment of interest on that judgment in accordance with this opinion.

---

[65] *Great Am. Ins. Co. v. AFS/IBEX Fin. Servs., Inc.*, 612 F.3d 800, 804 (5th Cir. 2010).

[66] TEX. INS. CODE ANN. §§ 542.053, 1807.001.